Argued November 7, 1935; affirmed February 11; rehearing denied
March 10, 1936.

## In re Rupert's Estate

## NASH et al. *v.* WATTERMAN et al.

(54 P. (2d) 274)

*Frank Lonergan* and *W. E. Richardson,* both of Portland, for appellants.

*A. E. Clark,* of Portland (Clark & Clark and R. R. Bullivant, all of Portland, on the brief), for respondents.

ROSSMAN, J. It is not claimed that W. C. Rupert lacked testamentary capacity or was subject to any improper influence on September 16, 1932, when he signed the will bearing that date. The beneficiary of that will is his nephew, Arthur A. Rupert, who was 39 years of age at the time of the trial—December, 1934. Dr. E. D. Schmidt, principal beneficiary of an alleged will signed July 19, 1934, contends that its execution revoked the will of September 16, 1932. Arthur A. Rupert, the nephew just mentioned, Charles Rupert, a brother of the decedent, residing in Chicago, and W. S. Nash, an attorney, who was nominated in the will of September 16, 1932, as executor, are the respondents, and allege that on July 19, 1934, Rupert lacked testamentary capacity and had been subject, over an extended period of time, to undue influence exerted by Dr. Schmidt for his own benefit. The circuit court sustained these contentions. We shall hereafter refer to

Dr. Schmidt as the appellant, although he has been joined in the appeal with C. C. Watterman to whom a bequest of $200 was given in the alleged will of July 19, 1934. The aforementioned nephew and a brother are the decedent's only living relatives.

October 25, 1927, Rupert executed his first will. In it he bequeathed $5,000 to his brother Gus, who was then living in Chicago. The remainder of his estate he gave to his nephew Arthur, and nominted as executor the aforementioned W. S. Nash. This will became misplaced, and on December 18, 1931, Rupert signed a second will, identical in its terms with the one just mentioned. Later, Gus Rupert died, and on September 16, 1932, decedent executed the will already mentioned. It bequeaths his entire estate to his nephew Arthur and, like the other two, nominates W. S. Nash as executor. The draftsman of all three wills was Mr. Nash. The draftsman of the alleged will of July 19, 1934, was Mr. W. E. Richardson who is now one of the attorneys for the appellant. That instrument devises to one S. B. Finegan "my property located at 1060 High street, Eugene, Oregon," bequeaths $200 to the aforementioned Watterman, and gives the remainder of the estate to the appellant. Although the title to the Eugene property was vested in the decedent, he held it merely as security for $3,500 due to him from Finegan. The residue of the estate which the appellant will receive, in the event that the alleged will of July 19, 1934, is sustained, is worth from $16,000 to $18,000.

Until the decedent was approximately 40 years of age he resided in The Dalles and there developed friendships which he valued highly throughout the remaining years of his life. He then moved to Portland where he continued to live until death overtook him in his 72d year. He never married. More than one of the witnesses

mentioned his immaculate attire, his well-fitting suits, his expensive shirts, his invariable custom of wearing a black derby hat and spats. He was a man who had many friends and seemed to prefer those of a convivial character. Card playing was a principal source of recreation for him, and the record indicates that he frequently played for sizeable stakes.

In 1916 he met the aforementioned W. S. Nash, who soon became his attorney and confidential advisor. In 1917 Rupert and one A. Rohde purchased a Portland restaurant entitled the Oyster Loaf and proceeded with its operation. This proved to be a very profitable venture and about this time Rupert began making other investments. Feeling the need of some trustworthy person to relieve him of details, he brought his aforementioned nephew from Chicago in 1920. Arthur did not disappoint him, and many of the witnesses commented upon the cordial and friendly relationship which at once sprang up between uncle and nephew. The latter was at first paid a salary of $100 a month; it was later increased to $175. He lived with his uncle in a two-room apartment, bearing a small portion of the expense. By 1931 the decedent had accumulated a fortune which Mr. Nash estimated as amounting to $100,000 or more. In 1926 Rupert constructed a house where both he and his nephew now made their home. Also residing there was one of the uncle's Eastern Oregon friends, a Mr. Farley who brought with him his daughter as housekeeper. In November of 1930 the nephew married a young lady whom the uncle had known for several years and whom he regarded with affection. The young couple chose as their home an apartment a few blocks from the uncle's place. After the marriage the cordial relationship between uncle and nephew and the latter's wife continued. Rupert frequently went to the young folks'

home for dinner, and the nephew's wife, as a friendly act, once a week cleaned the uncle's house. In the meantime, Farley had died, and his daughter had married.

The decedent, in December, 1931, when 70 years of age, suffered a severe apoplectic stroke which incapacitated his left side. The day previously Mrs. Rupert had been doctoring him for a severe cold and now returned to take charge of the patient. She summoned a physician and shortly thereafter she and her husband moved into Rupert's home for the purpose of giving him better attention. A nurse was employed and for approximately two months the decedent was bedridden. After he was able to leave his bed and get around with the use of a cane, Arthur's wife, to whom we shall hereafter refer as Mrs. Rupert, took him each afternoon to the Oyster Loaf where he was fond of eating dinner, and sometimes for visits to his old-time friends.

About the middle of 1932, according to Mr. Nash, Rupert became greatly worried about his financial condition. For some time the Oyster Loaf, which was owned by a corporation of which the decedent owned 50 percent of the stock, was no longer earning dividends. In fact, it was incurring deficits. Some of the decedent's other investments had become valueless. To Mr. Nash Rupert expressed anxiety lest he become a charge upon his relatives. According to Mr. Nash, two of the larger restaurants of Portland at that time were in possession of receivers, and any of them were obtainable at any price offered. Rupert now importuned Mr. Nash to find a buyer for his interest in the Oyster Loaf, and, when results were not forthcoming, urged him to propose a sale to Arthur Rupert and Rohde's son George. A. Rohde by that time had died and his interest in the Oyster Loaf was now owned by George. At that time the decedent owned his original 50 shares, together

with 19 shares which he had acquired from A. Rohde through the failure of the latter to discharge a loan. May 17, 1933, the sale of these 69 shares was consummated. The capitalization of the Oyster Loaf was $10,000, divided into 100 shares. The assets of the Oyster Loaf were entered upon its books as worth approximately $10,000. In a written contract signed on that day, Arthur agreed to purchase 50 shares for the sum of $5,000, payable at the rate of $100 per month. The instrument provided that in the event the uncle died before 50 $100 payments had been made no further sums would be payable; but in the event the uncle continued to live after the 50 $100 payments were made, Arthur was required to pay his uncle $125 per month until his death. Mr. Nash testified that he suggested the provision just mentioned so as to assure the decedent an income for life. On the same day the 19 shares were sold to George Rohde at a price of $100 per share, payable in installments of $35 per month. Although the appellant argues that the uncle subsequently believed that Arthur had practiced deceit in the consummation of this transaction, this contention is virtually without foundation. To the contrary, reliable, substantial evidence indicates that the transaction was fairly consummated and was regarded by the uncle with distinct manifestations of satisfaction.

In the fall of 1932, the decedent, while visiting a friend in Tillamook, met the appellant who had shortly prior thereto undertaken the practice of his profession in that city. The appellant for some years had moved from place to place and had engaged in various occupations, principally that of the practice of naturopathy. Success had not favored him, for he had no bank account and the only property which he possessed in 1932, apart from his naturopathic equipment, was an automobile,

the title to which was vested in his daughter's name, and which was taken from him in 1933 through his default in maintaining his purchase price payments. In January or February, 1933, the appellant, being dissatisfied with conditions in Tillamook, moved to Portland, leaving unpaid several small accounts. He established his naturopathic equipment in a house at East Tenth and Burnside streets in Portland where his family now took up its abode. He soon sought out the decedent, and in April, 1933, began treating him. Three treatments per week were given, which consisted in part of hot baths and massages. However, at this time, and until Thanksgiving day of 1933, Rupert had in his employ a nurse who resided at his home and who daily massaged and bathed him.

At first Mrs. Rupert took the decedent to appellant's place in Arthur's car, but soon the appellant adopted the practice of calling for and returning him. Witnesses swore that after appellant had adopted this practice Rupert frequently was brought home intoxicated. In May, 1933, Dr. Schmidt, according to Arthur's testimony, sought him out in the Oyster Loaf, declaring that he had taken the decedent to a hotel room but was unable to locate him again, adding, "The boys are taking him for a trimming." This hotel room was a favorite rendezvous for a group of which Rupert was a member. Here cards were played for stakes. About this time checks, signed by Rupert and payable to cash, aggregating between $1,500 and $1,600, were presented at Rupert's bank for payment by various unidentified individuals. The conclusion is inescapable that these sums were lost in gambling. We shall later review evidence which shows that by this time Rupert's physical and mental condition had declined. As already indicated, Rupert in this period was frequently brought

home intoxicated. The nurse and Mrs. Rupert, in so testifying, swore that those who brought him home sometimes merely placed him upon the porch and left before their identity could be discovered. After being brought in the house he was undressed and put to bed.

About the time when the aforementioned checks were coming into the bank for payment, another incident occurred which we shall now briefly describe. A friend called at Rupert's home and took him away in his car, but Rupert failed to return home that night and also the following night. His family gained their first information of his whereabouts from an account in a newspaper which stated that Rupert had collapsed in Salem and had been taken to a hospital. Arthur, his wife and the nurse hurried to Salem where they found Rupert in a hospital. The facts were that Rupert and a group, after calling at three places between Portland and Salem where drinks were taken, had finally reached Salem at night. The following morning he collapsed in a barber shop. An ambulance was summoned and he was conveyed to a hospital. In the meantime, his friends had left.

A few days after Rupert was returned to his home from the revelry just mentioned he called at the office of Mr. Nash, from whose testimony the following is quoted:

"He was very weak physically; he was able to walk but he was not well at all. It was probably a week after he had been on this—after he had had this collapse at Salem, Oregon. I remember he looked very worn and tired and he was dejected and low in his spirit; he said that he wanted some help. 'Well' I says, 'who do you want, Mr. Rupert, to help you?' 'Well,' he said, 'Art, of course.' He says, 'Art has taken care of my affairs and helped me for a long time and I want Art.'"

Mr. Nash testified that questioning developed the fact that Rupert wanted Arthur to become his guardian. After Rupert had left Mr. Nash asked Arthur whether he would be willing to become guardian, and the reply was in the affirmative. A day or two later Rupert inquired of Mr. Nash whether he had prepared the necessary papers and indicated his desire to have the appointment made promptly. Mr. Nash then prepared a petition to be signed by both the uncle and the nephew. It prayed for an adjudication of Rupert's incompetency and Arthur's appointment as guardian. The following is a part of the petition:

"The said W. C. Rupert is partially paralyzed; that by reason of old age and said diseased condition of his body, the said W. C. Rupert is unable, unassisted, to properly manage and take care of his property; that by reason of his physical condition he is likely to be deceived or imposed upon by artful or designing persons - - - that the said W. C Rupert has been imposed upon and induced to part with property belonging to him by certain persons not interested in or responsible for his welfare, and that unless a guardian is appointed to conserve and protect his estate it is probable that the said W. C. Rupert will soon be reduced to want . . . that the said W. C. Rupert, realizing that he is incompetent, and desiring to be protected against the loss of his property, desires that the said Arthur A. Rupert be appointed guardian of his estate. . . ."

The petition was signed by uncle and nephew June 13, 1933. A citation and a copy of the petition were served on Rupert June 14, 1933. June 27, 1933, the court entered an order adjudging Rupert an incompetent and appointing his nephew guardian. Arthur swore that he never suggested to his uncle nor to anyone else that the proceedings be instituted, and that the first mention of a guardianship for his uncle was made to him by Mr. Nash. He also swore that his uncle never

voiced to him any objection or criticism whatsoever concerning the guardianship. According to him and others, the relationship between him and his uncle continued cordial until the developments occurred which we shall presently describe.

Shortly before July, 1933, the appellant's automobile was repossessed by the vendor. In July he and Mr. Rupert sought from Mr. Nash enough money for the purchase of a new car. According to Mr. Nash, the appellant was very insistent. Finally, it was agreed that Arthur, as guardian, should loan the appellant $125. This was done and a car was purchased. According to the testimony, the appellant now took Rupert upon numerous trips, some of which were of considerable length.

About this time Rupert began to evidence ill will towards his nephew's wife. Rupert's nurse and Mrs. Arthur Rupert had kept a record of the treatments given Rupert by the appellant, and upon one occasion when the appellant presented a bill which sought payment for more treatments than the record indicated had been given, Arthur, as guardian, challenged the bill. The appellant resented this. Next, according to Mrs. Rupert, "I overheard the doctor telling him (Rupert) not to talk to me, not to tell me anything, because I knew too much; I was telling Art everything; so shortly after that, why, he kind of stopped talking to me; but if I asked him just any direct question, why, he would answer, but no lengthy conversation at all." The nurse gave similar testimony. The latter part of 1933 Rupert, according to Mr. Nash's testimony, came to his office "very much excited, in a very bad state of mind, very angry, and told me that Dr. Schmidt had told him that Frances Rupert was stealing things out of the house. I said to Mr. Rupert, 'This is not true, you must not

believe that anything like that could happen, because it isn't true. Neither Frances nor Art would take anything out of the house.' And I talked to him and calmed him down. . . . In the course of ten days or two weeks he came back again and he was more excited, if anything, than he was the first time, and he says, 'I am satisfied that Frances Rupert is stealing something out of the house; Dr. Schmidt has told me so.' " Rupert's friendly attitude towards the nephew's wife was ended.

About October or November of 1933 Rupert became dissatisfied with Mr. Nash. About this time he began to consult with Mr. Frank J. Lonergan, attorney at law, and later with Mr. P. J. Hannon, another member of the bar. From time to time he visited their offices. He told Mr. Hannon that he would like to have the Ruperts move from his house. Mr. Hannon communicated this wish to Mr. Nash, and in a few days the Ruperts moved out. Rupert's nurse testified that the appellant prompted him to take this action. The first time that Rupert called upon Mr. Lonergan he expressed dissatisfaction with the fact that he had been adjudged an incompetent, and also with the fact that Arthur was his guardian. Mr. Lonergan testified: "I thought maybe that the old man would get over his peeve if the thing was dragged along, and I certainly dragged it; there was no question about it; I dragged it along through October, November and December. . . . Mr. Hannon was in perfect accord with me on the proposition of stalling this thing along with the hope that it would die out." According to Mr. Hannon, "He (Rupert) took very violent exception to the word 'incompetent'; he didn't like to be classified as an incompetent. That seemed to be the sore spot with him." Mr. Lonergan knew Arthur, and testified that

he realized Rupert's affairs were receiving proper care. It is evident from the testimony of these two capable and honorable attorneys that they did not regard with favor the efforts of a sick old man, irritable and depressed, to engage in litigation those who were earnestly trying to help him in his declining years.

For 25 years Rupert and Albert M. Mitlehner had been friends. While Rupert was consulting with Mr. Lonergan and Mr. Hannon he requested Mr. Mitlehner to become his guardian. The latter was willing. March 21, 1934, Arthur resigned as guardian and on the same day Mr. Mitlehner, upon his petition describing W. C. Rupert as an incompetent, was appointed guardian. Mr. Hannon prepared the petition and swore he read it to Rupert. Arthur made no charge for the services that he had rendered and promptly filed his final account as guardian. The evidence indicates that when the report was filed the appellant brought Rupert to Mr. Nash's office and claimed that Arthur's account was $1,000 short. He made a similar contention to Mr. Hannon. The account was then carefully reviewed and no error was discovered; nor was the appellant able to point out the shortage he insisted upon. Mr. Hannon testified that he believed the account was correct. The evidence, however, indicates that the appellant still insisted, in Rupert's presence, that the account was $1,000 short. Thereafter Rupert never returned to Mr. Nash's office.

Mitlehner testified that almost as soon as he had taken upon himself the duties of guardian Rupert began to find fault with him. He protested violently Mitlehner's failure to collect a $900 note. According to Mitlehner, "He (Rupert) accused me and Mr. Lonergan and Mr. Hannon and Mr. Nash and everybody else of holding that money up so he shall not get hold of it; I

tried to explain it to him, but it was impossible for me to explain it to him; he said we were all in cahoots.'' The witness testified that Rupert accompanied his protests with much profanity which he, the witness, could not stop. According to Mitlehner shortly after his appointment Rupert began to protest about the guardianship, stating that he "wanted to manage his own affairs". June 18 Rupert filed a petition for the vacation of the order declaring him an incompetent. Mr. Hannon testified that the appellant brought Rupert every time he called upon him, and that on all these occasions, with one exception, the appellant remained in his office while he and Rupert were discussing his affairs. Upon that one occasion, according to Mr. Hannon, "I asked Dr. Schmidt to step out of the room." These discussions, according to Mr. Hannon, included the subject matter of making a will.

Beginning July, 1933, the appellant became a daily visitor to Rupert's home. At that time he was not treating Rupert at his home and the visits were of a purely social nature. It was about this time that Rupert began making accusations that his nephew's wife was stealing items. He also accused her of keeping rent which for many years she had collected monthly for him from a tenant. To his nurse he claimed that the nephew's wife was a poor housekeeper and made other derogatory remarks concerning her. The evidence indicates that these accusations were wholly without merit. The nephew's wife sought earnestly and tactfully to please him. The testimony of witnesses who were apparently disinterested indicates that many of these accusations were prompted by the appellant. As we have stated, the nephew and his wife moved out of the Rupert home in January, 1934. April 1, 1934, the appellant with his wife and two children moved into this

home. At that time the appellant was in default for one month's rent of his premises at East Tenth and Burnside streets, and claimed that when he had disclosed his financial condition to Rupert the latter invited him to move into his home. In one of the rooms he set up his electrical instruments and now proceeded to treat what few patients he had at Rupert's home. He paid no rent, but charged for his services. He has filed a claim against the decedent's estate for $100 per month for services rendered. Appellant and his family continued to reside there until Rupert's death. Rupert now discontinued his visits to the Oyster Loaf. When visitors called at the home they were always met by some member of the appellant's family, and on most occasions the appellant was present when anyone visited Rupert.

The above will have to suffice as a description of the relationship that existed between Rupert and the appellant. It will be observed that while at the beginning the appellant was only Rupert's physician, he gradually became more than that. Shortly he became physician, friend and advisor, and, finally, he added to his relationship by taking charge of Rupert's home. In fact, the Reverend John A. Rippey, who was summoned on July 21, 1934, to confer with Rupert upon spiritual matters, referred to the house as "the home of Dr. Smith".

We come now to the evidence which describes Rupert's mental condition. All agree that before the apoplectic stroke of December, 1931, he possessed a keen mind and, as already stated, he was a fastidious dresser. More than one of the witnesses noticed a progressive decline, physical and mental, after the stroke. The nephew, the latter's wife, the nurse and some of the neighbors testified that by 1932 Rupert

had become increasingly indifferent about his personal appearance and frequently neglected to properly arrange his clothing. Many of the witnesses, including Mr. Nash, testified that Rupert constantly grew weaker physically, and that his ability to grasp matters declined. They noticed that as time went on he became very irritable and that his memory became poor. Mr. Nash testified that by the latter part of 1933 Rupert distrusted his relatives and old friends. From the testimony of the same witness, we quote: ''His clothes were usually disarranged; many times the pants buttons were unbottoned; his overcoat would be half on him, half off. Sometimes he would sit there with his hat on down over his eyes and he seemed to be in considerable pain and he could not sit very long; he was restless.'' Rupert's nurse, who appeared to be wholly disinterested, testified that after the Salem incident the impairment of his mental and physical strength became very marked. According to her, he became slovenly in his dress; at times he threw his food on the floor; broke light bulbs with his cane; turned on the water faucets in the house, apparently without any purpose; turned off the gas while food was being cooked; destroyed growing flowers; hid his cigars in various parts of the house; searched the house for persons who were not there; sat for long periods with a newspaper or the Bible in front of him without turning a page; and at other times tore the newspaper to pieces before he or others had read it. Both she and Mrs. Rupert swore that he could not recall from day to day whether he had had a treatment. Witnesses testified that he many times sat holding reading matter, which apparently he was reading, but which was upside down. Some witnesses commented upon the fact that he would relate a story time after time, unmindful of the fact that he had

already told it. The nurse and some of Rupert's friends testified that occasionally when a visitor called he would sit motionless, staring into space, apparently oblivious of the presence of his caller. Several of the witnesses testified that Rupert frequently had crying spells. One of them described these spells as being real sobs and mentioned one that occurred at her home at the dinner table. In February of 1934 he failed to recognize one of his old-time friends while eating dinner with him at the Oyster Loaf; in fact, his conversation indicated that he did not realize he was in his old restaurant. In the same month he failed to recognize George Rohde's wife when he saw her in the same restaurant, although he had known her well for years. One of the appellant's witnesses, Peter Kastavalis, who formerly worked for Rupert as a waiter at the Oyster Loaf, and who served him whenever he came into that establishment, testified that in July, 1934, he was working at the Quelle restaurant, to which the appellant brought Rupert. He swore that Rupert failed to recognize him and that when he placed a menu card in front of him "he couldn't hardly see, and he threw the menu down and he says to me, 'Oh, something to eat I want.' " Knowing Rupert's favorite dishes, he brought him some food and, after Rupert had eaten, sent him home in a taxicab. He swore that it was virtually impossible to converse with Rupert at that time, and that he was so weak that he could not walk without assistance.

We now quote from A System of Legal Medicine, Vol. II, page 109, wherein the text states the symptoms of senility:

". . . or there may be nothing else but an apparent increasing mental feebleness, with loss of memory, irritability, and superficial delusions of suspicion and persecution, and he is apt to believe that he has been

robbed. He conceals and hides his papers, or puts useless objects he may have hoarded in out-of-the-way places. He may tie a stone or cigar-end in his pocket handkerchief, or secrete bits of thread, buttons, etc., in his different pockets. He is wakeful and is inclined to wander from room to room during the night, or away from home, and, like a young child, is afterward unable to give much account of himself. His unconcealed immoralities are noticeable, and he indulges in orgies . . . In a more advanced form he urinates publicly and ostentatiously; he is careless of his dress, leaving his trousers unbuttoned. He is vacillating, and apt to squander his money recklessly; enters into absurd schemes, or gives his property away to persons who have no claim upon him whatever. He is the prey of sharpers or confidence men."

In our opinion reliable, substantial testimony indicates that beginning with 1933 Rupert evidenced the various symptoms stated in the above definition.

The appellant testified that after he had taken charge of Rupert he became convinced that his patient suffered from a pyloric ulcer and a toxic condition. He did not avail himself of an X-ray or hospital examination of the patient, and, although he swore that his patient vomited at least six times in his presence, he did not examine the stomach contents for the purpose of determining the correctness of his diagnosis. He admitted that he did not tell Rupert's nephew, guardian, friends, nor anyone else, with the possible exception of the nurse, his conclusion that Rupert had stomach ulcers. He was quite sure, however, that he did not acquaint the nurse with his belief. In explanation of his silence, he said "it wasn't nobody's business". The appellant swore that on July 20 "about five o'clock, probably towards six, he (Rupert) had a hemorrhage" in the course of which he "lost about a quart and a half of blood, probably more". He swore that the blood

flowed from Rupert's mouth and also through his bowels. Nevertheless, he testified that shortly after the hemorrhage had ceased he dressed Rupert and assisted him downstairs where he sat in a chair. While in the kitchen Rupert drank a glass of milk and discussed the Oyster Loaf restaurant, according to appellant. Next, he was taken to the living room and an hour and a half later, according to appellant, was returned to his bed. The appellant admitted that the hemorrhage weakened Rupert "very much; it would anyone". He testified, "I lost hope then", and added, "I knew that was a very serious condition and was about the last; it was about the last step." He testified that immediately following the hemorrhage he telephoned to Mitlehner apprising him of the development. Appellant swore that about a month before this development he noticed blood in his patient's mouth, and "I knew he was slipping" then. He swore that after the hemorrhage of July 20 other hemorrhages followed and that Rupert got "worse very rapidly".

Referring to decedent's mental condition to and including July 20, 1934, appellant testified: "Just as good as you would expect of a man of his age. You take a man getting older gradually, he isn't getting any better, gradually, physically, he became weaker, but mentally he was alert." He denied that Rupert ever cried and swore that he could converse intelligently until after the 20th.

The appellant did not verify his diagnosis by consulting with any other physician until June 28 when he summoned Dr. Harold Hulme, another naturopath. Dr. Hulme, as a witness for the appellant, testified that he did not subject Rupert to an X-ray or hospital examination, but examined him at Rupert's home. He expressed a belief that the appellant had properly diag-

nosed his condition and was giving him the proper naturopathic treatment. He testified that on June 28 Rupert was in bad shape and that his early demise was expected. He was again summoned on July 15 and then described Rupert's condition: "Very much weaker at that time; very much weaker." On both occasions Rupert was in bed. Further describing Rupert's condition on the 15th, Dr. Hulme testified: "He came forward, in spite of his weakness, and put out his hand and remembered my name,—he said, 'Dr. Hulme' as well as he could speak it; 'Dr. Hulme, glad to see you—too late,' he said, 'I'm thinking.' And that was the full and sum total of what occurred at that time." It will be recalled that the contested will was signed July 19, 1934. The witness swore that on July 15 the patient was so much weaker than on June 28 that he inquired of the appellant what had occurred. If he received a reply he did not disclose it, but he (Dr. Hulme) attributed the marked decline as due to "extreme pain in the abdomen. . . . exhaustion from that; . . . intestinal trouble, possibly stasis". Concerning Rupert's mental condition on these two occasions, the witness swore: "Well, as well as a person so sick as he was, and confined to bed—I should say he was mentally strong, because the conversation and the repartee that passed between us as doctor and patient, inviting me back again, was rather startling to me, for a man in his condition." He observed that on July 15 Rupert was so weak that it was obvious that he would shortly die and that the appellant shared that belief. By that time Rupert had abandoned hope of recovery and realized that death was near. Dr. Hulme returned on July 21 and swore that shortly before his arrival Rupert had vomited blood, but he denied that any hemorrhage carrying blood into the bowels had occurred up to that

time. He was back again on the 24th and swore that the hemorrhage which caused blood to pass into the patient's bowels occurred on that day. According to this naturopath, who is secretary of the naturopathic association, the proper treatment for a patient who has had such a hemorrhage is to place him upon his back so that the torn stomach surfaces may unite. According to the transcript, Dr. Hulme, in order to assure himself of accuracy while testifying, repeatedly referred to notes which he had made during the course of his visits to Rupert.

It will be recalled that the appellant swore that decedent had a hemorrhage on July 20 about 5 p. m., and that he also swore that, at its conclusion, he telephoned to Mitlehner. Appellant further testified that at about 6 p. m. of July 20 Dr. Joseph D. Sternberg called at the home and that at that time blood stains, resulting from the hemorrhage, were plainly visible, and that he told Dr. Sternberg what had just occurred. Dr. Sternberg, a medical practitioner, was sent by Mitlehner to examine Rupert. He testified that he arrived in the afternoon of July 20, but saw no blood stains. He was positive that appellant said nothing to him about a hemorrhage. He stated that, although the appellant told him that Rupert was suffering from ulcers of the stomach, "it didn't appear to me that it was that type of a case at all. . . . It rather impressed me as being one of high blood pressure with a poor heart and kidney involvement". He recommended that Rupert be taken to a hospital at once, adding, however, "I didn't think it was of much avail myself, because the man was in such extreme condition that I doubted whether I could do him any good even though I did know what the trouble was." He described Rupert's condition further in the following answers: "He

was a very sick man. . . . Yes; he was so old and feeble it looked like a hopeless situation. . . . I don't think he was in very good mental condition, not sound mental condition. . . . He had had a stroke two years or so previously and that always, practically always, slows them up considerably mentally, and he was old, feeble, and very sick, and he showed signs of mental weakness."

Dr. W. Hugh Williamson, a physician who specializes in mental and nervous diseases, visited Rupert on July 19 and remained there, according to his statement, for two and a quarter hours. Appellant had telephoned to him at the request of Mr. W. E. Richardson, the attorney who wrote the will of July 19, 1934, asking that he examine Rupert and report to the attorney. Dr. Williamson expressed the result of his examination thus: "I understood that I was to go over there to pass on his mental capacity and for the purpose of some legal performance, and I called up the attorney after I finished and told him I thought he was competent." The witness added that Rupert seemed alert and that he (the witness) saw nothing to indicate lack of testamentary capacity nor anything which would indicate duress. He swore that Rupert "told me about having a brother in Chicago and a nephew who had lived with him. . . . He made the remark that he had to get rid of his nephew." The witness testified that while he was there Rupert arose from his bed and, with the assistance of the appellant, went to the bathroom, but that he did not discover that Rupert was affected with paralysis. His failure to take note of that fact should be considered in connection with the appellant's testimony that a stroke "forms a blood clot in the capillaries; and if nature doesn't remove that, he will con-

tinue being of unsound mind, but if nature removes that, he can be as sound as he has been before".

Further considering the evidence which reveals Rupert's mental condition in July, 1934, we revert to the testimony of Mitlehner. He had been an intimate friend of Rupert for a quarter of a century. He saw him for the last time on July 11. He testified that towards the end Rupert was more irritable each time that he saw him, and that it required greater efforts to calm him. He finally resorted to giving Rupert small checks from time to time which pacified him. In defining his condition, he used the words: "Mentally disturbed in the way of anger, probably, as I should probably put it. . . . Every time I seen him he would get angry at me." The witness testified that Rupert spoke to him about making a will "emphatically, several times". He was surprised to hear this, "and, naturally, the question came to my mind, I says, 'What do you want to make a new will for?' Well, he informed me it's none of my business," in very profane language. Apparently, Rupert mentioned a new will on many occasions because the witness stated: "He never got into details as to what disposition he wanted to make or went into details regarding the will; all he would do by the time that he would get that far along—he was, as I said a while ago, was irritable to me and then he would stamp his cane again and that was the end of the session." It will be recalled that Mitlehner was one of the appellants' witnesses. He was not asked for his opinion concerning Rupert's competency.

Mr. Hannon, the attorney previously mentioned, after stating that Rupert first called upon him in the early part of 1934, and that the last call was two or three weeks before his death, testified: "I considered him competent. As far as the guardianship was con-

cerned, I considered he could handle his own affairs.''
Mr. Lonergan, although testifying, expressed no opinion concerning Rupert's competency. Mr. W. E. Richardson, the attorney who prepared the contested will, saw Rupert once on July 17, 1934, and twice on July 19. None of the conferences lasted for more than an hour's time. He had never seen nor known the decedent before. He expressed his opinion concerning Rupert's mentality thus: ''There was no question in my mind as to his testamentary capacity; I think he was strong mentally. . . . He discussed what property—discussed his property with me, how he wanted to leave it, his family affairs; and when he wanted to write a letter setting forth the details of what he thought that his nephew had done and his wife, and, and I suggested—''
At this point he was interrupted, but later added: ''I suggested to him that many things would be better unsaid,'' as a result of which the letter was not written. Mr. Richardson's wife, as well as himself, was present at the execution of the will as attesting witness. This was July 19. She thought this visit lasted fifteen or twenty minutes. She testified that she discussed with Rupert one or two items of current interest and expressed the belief that he was mentally sound. Both she and Mr. Richardson swore that they observed nothing which would indicate that Rupert was under duress or subject to coercion. Many other witnesses expressed opinions concerning Rupert's mental condition towards the close of his life. Their opinions, like those already reviewed, vary. We can not mention each of these opinions. In this proceeding 69 witnesses testified. Three or four of these opinion-witnesses reported that Rupert engaged with them in brief conversations. One of these was the individual in whose hotel room Rupert apparently sustained his heavy losses in May of 1933.

This witness testified that he had a conversation with Rupert in the lobby of the Oregon Hotel ten or twelve days before the latter's death. He found Rupert's mental condition good on that occasion. But the witness could recall virtually nothing concerning the card games. Even the prodding of diligent cross-examination in the form of leading questions elicited virtually no information concerning the players and other details. A witness with such a faulty memory may be mistaken about the time when this last conversation occurred. Two neighbors testified that they noticed nothing which indicated that Rupert's mental condition was failing. They, however, specified no time and their opportunities to make observations were only casual. To a friend of long standing who called upon Rupert in June of 1934 the latter seemed "doped" or "dazed". Another who saw him near the end thought he was "in a stupor".

A circumstance indicative of Rupert's mentality, which we deem very significant, was developed, possibly unwittingly, by the appellant himself. After he had moved into Rupert's house, about four months prior to his death, we find he always accompanies Rupert wherever the latter goes. He must have thought his presence was necessary. If Rupert went to his attorney, the appellant went along and even stayed in the room while the consultation took place. At times he even participated in the conferences. If anyone called upon Rupert, the appellant remained by his patient's side during the visit. If Rupert called upon a friend, the appellant accompanied him. When Dr. Williamson called to examine Rupert, the appellant was near at hand. In June, 1934, the appellant took Rupert, according to Finegan's testimony, to a picnic near Corvallis. They arrived the day before the picnic. Appellant remained constantly at his patient's side, seeing

to it that he had a room for the night, and taking him to the picnic the following day. In fact, so far as the record discloses, Rupert was by himself only three times after appellant became his physician and companion. Once was the occasion when appellant sought out Arthur, stating that he had lost Rupert in a hotel, and that the boys "were taking him for a trimming". The second occasion was the time when Rupert was taken to Salem and was finally located in a hospital. The third occasion was when the appellant left Rupert upon the sidewalk in front of the Quelle restaurant. Here the decedent could not open the restaurant door, failed to recognize his old waiter friend, did not know the purpose of the menu card, and, finally, managed to mutter something which was interpreted as a desire for food. Apparently, Rupert actually needed a companion. Again, the manner in which the decedent turned against his attorneys and those who were earnestly trying to help him is significant. We are satisfied that there existed no reason why he should have broken with his nephew and the latter's wife, nor with Mr. Nash. The record reveals no justification for the treatment that he accorded his friend Mitlehner, who accepted the guardianship after Arthur had resigned. Nor does the record indicate why Rupert suddenly left Mr. Hannon, after discussing will making with him, and went to an attorney who was a stranger to him. That is, the record discloses no reason for these severances of established relationships unless it be senility.

Possibly explaining, to some extent, the differences in opinion concerning Rupert's mentality as life flowed away from him near the end, is the fact that sick persons have their good days and their bad days. Very likely he was no exception. Possibly reclining in his bed with a comfortable pillow at his back, Rupert could get

along fairly well when Dr. Williamson, with cultivated sick room manners, was present. Mr. Hannon's opinion may be based largely upon the impression which he obtained in the early days of his contacts with Rupert. It will be recalled that when Mrs. Richardson saw the decedent, on July 19, the latter was in bed. Her husband saw him twice in bed. A sick person can be prepared for company.

■ We are satisfied that when the will of July 19, 1934, was signed Rupert was in an advanced stage of senility. He was very weak, physically and mentally. His wrath could easily be provoked; to cross him was to incur his enmity. We notice how quickly he turned against his old friend Mitlehner the first time the latter crossed him. An explanation based upon the truth was of no avail, but, with an outburst of profanity and lusty thumps of his cane, this willing friend was consigned to the discard. But to humor Rupert with petty favors in this unfortunate period of his life gained his gratitude. For instance, the will of July 19 contains a bequest of $200 to an individual named Watterman whose relationship with the decedent had been so limited that the latter did not know Watterman's first name or initials. That information had to be supplied by the appellant. The transcript of evidence contains no information concerning Watterman, but the ease with which Rupert's favor could be obtained towards the close of his life is indicated by the following excerpts taken from appellant's brief, which gives us our sole information concerning Watterman: "He knew W. C. Rupert for a short time . . . went there to discuss religious matters and not business matters . . . it was due to the Bible reading of C. C. Watterman." It is our belief that while Rupert, on July 19, 1934, may have had sufficient mentality to constitute

testamentary capacity, yet the margin in his favor was very slight. In our opinion, his memory was poor, his ability to think for himself was largely gone, and he was an easy subject for any designing person who curried his favor.

We come now to the circumstances attendant upon the preparation and signing of the will of July 19, 1934. As already stated, on July 17, 1934, Rupert, accompanied by the appellant, went to the office of W. E. Richardson, an attorney who was a complete stranger to him. Mr. Richardson, apparently, did not know how it happened that he was selected to draft Rupert's will. He testified, however, that in 1930 the appellant had come to his office twice concerning some political matter. The appellant offered no explanation as to how it happened that Mr. Richardson was selected. Rupert's inquiry whether he could make a will while under guardianship brought forth an affirmative reply and also a request that he be examined by Dr. Williamson, the alienist above mentioned. July 19 Dr. Williamson expressed the opinion which we have already mentioned. About 5 o'clock in the afternoon of that day the appellant drove Mr. Richardson to Rupert's home where a short conference took place with Rupert, in the course of which the latter expressed his wishes concerning the disposition of his estate. The appellant then returned Mr. Richardson to his office where the will was drafted. In about half an hour the appellant drove Mr. and Mrs. Richardson to Rupert's home for the execution of the will. Mr. Richardson testified that during the execution of the will no one was in the room except Rupert, Mrs. Richardson and himself. Apparently, upon the other two occasions the appellant was present. Although the latter knew that Rupert had spoken to Mr. Hannon and Mr. Lonergan about a new

will, he did not acquaint Mr. Richardson with that fact. Nor did he inform Mr. Richardson that Mr. Mitlehner, an intimate friend of Rupert, was his guardian and that Rupert had mentioned will making to him. The will of July 19 contains a devise for S. B. Finegan of the value of $3,500. While Rupert had known Finegan for many years, there is nothing in the record that indicates that he was an intimate friend. At Finegan's picnic in the middle of June, 1934, nothing occurred to indicate that either had great regard for the other. In fact, the appellant had to obtain quarters for Rupert the night before the picnic at the home of a daughter of Rupert's old-time friend, Farley. Before Rupert was placed under guardianship he had attempted to collect something upon this $3,500 obligation but without avail. The endeavors were continued after the guardianship. We have already mentioned the fact that the identity of Watterman is nowhere disclosed in the transcript of the testimony. He did not testify. Rupert had many friends whose relationship to him had been much more intimate than his relationship with the three individuals mentioned in the will of July 19, 1934.

The fact that the will of July 19, 1934, had been executed was disclosed to no one until it was presented for probate. After the funeral service Mr. Nash and Mrs. Rupert called at Rupert's home and, with Mrs. Schmidt's permission, made an inventory preparatory to probating the will of September 16, 1932. They inquired of her about her plans concerning the home after an executor had been appointed. Her reply was evasive. Then the appellant appeared. Even then, no intimation was made that Rupert had signed a new will. Mr. Nash gained his first knowledge of it from a newspaper item that was published a day or two later.

Mr. Hannon expressed his surprise when he heard of the new will by declaring, ''Well, that is news to me.''

In a preceding paragraph we stated that in 1934 the appellant was not only the decedent's physician, companion and advisor, but had also assumed charge of his home. In fact, Rupert's home had become appellant's home. Here the appellant, his wife and two children resided. Here the appellant had installed his equipment and was treating his patients. It does no violence to the truth to say that Rupert had become the guest of the appellant in the latter's home. Thus, the principal beneficiary of the will now under consideration had taken possession of his testator's property and had also assumed charge of his person. Under these circumstances, a conclusion is certainly warranted that a personal or confidential relationship existed between the two men: *In Re Knutson's Will*, 149 Or. 467 (41 P. (2d) 793). Appellant argues that influence arising from friendship and esteem is not undue. But the record does not show that the appellant rendered his patient any service through friendship. He charged for everything he did, even for the gasoline he used when he took his patient upon trips. The relationship of appellant to the decedent was founded upon a duty which the appellant was performing in consideration of money paid. That being true, the appellant can very properly be required to render an accounting of the influence which he obtained over his patient.

In *In Re Knutson's Will*, supra, we reviewed at length the principle frequently employed in will contest proceedings which holds that a beneficiary of a will who sustained to the testator a confidential relationship, and who actively participated in making the will, must assume the burden of proving that he exerted no undue influence in the making of the will; that is, the

burden of coming forward with evidence is reversed. A presumption of undue influence arises from the two circumstances just mentioned. The ultimate burden of producing conviction still must be discharged by the contestants of the disputed will, but they have the benefit of the presumption of irregularity. In addition to the authorities reviewed in the decision just noted, see also the citations accompanying the text in 68 C. J., Wills, p. 758, § 451. We believe that the facts bring the present case clearly within that rule. The appellant not only sustained to Rupert a confidential relationship but actively participated in the making of the will. Since Mr. Richardson was a stranger to the decedent, but an acquaintance of the appellant, we are justified in assuming that he was selected upon the appellant's recommendation. The appellant accompanied the decedent to Mr. Richardson's office and was present when will making was discussed; he was the one who telephoned to Dr. Williamson the request that he examine Rupert; he twice drove Richardson to the decedent's home; he was present in the house when the will was signed and he supplied Watterman's initials. Shortly prior to the execution of the will the appellant was present in Mr. Hannon's office when will making was discussed, except upon one occasion when Mr. Hannon asked him to retire. Presumably he knew the decedent's plans concerning the disposition of his estate. The burden, therefore, rested upon the appellant to come forth with evidence that he did not influence the decedent in the preparation of the will, and to overcome the presumption of irregularity. Since the appellant had possession of his patient's home and person, that presumption is peculiarly applicable. He had the means of keeping his fraud, if any, out of sight. Fraud, deceit and undue influence are rarely suscep-

tible of direct proof, especially when the victim and his property are in the possession of the alleged wrongdoer, and the victim has since passed to the grave.

We have carefully read the appellant's denials that he did not influence the decedent against his relatives and friends, nor in the preparation of this will. But denials alone will not suffice. He participated in the will making and owed a duty to give an explanation of occurrences which only he could explain. Although he denied that he caused his patient to break with Mr. and Mrs. Arthur Rupert, he does not claim that he ever cautioned the uncle that his attitude against Mrs. Rupert was not warranted. We add that the appellant does not argue that the uncle was justified in asking his nephew to move out of the home. Although the appellant denied that he caused Rupert to break with some of his old-time friends, he does not claim that after he took charge of the home he invited these friends to call. Likewise, although the appellant denied that he sought to influence his patient in the disposition of his estate, he does not claim that he called to the decedent's attention his duty to his relatives, Mr. and Mrs. Arthur Rupert who had been devoted to him for many years. Possessed of the influence which he held over the decedent, the latter's mention of an intention to make a will and include a devise in it for appellant, should have caused the latter promptly to retire from the scene. If he wanted to participate, he should have surrounded the decedent with those of his old-time friends who would have given him disinterested advice. Far from doing that, he failed to inform the attorney who drafted the will that the decedent had already consulted Mr. Hannon about a new will and had spoken to his guardian upon the subject.

But in endeavoring to determine whether the appellant abused his confidential relationship, we are not dependent upon appellant's denials alone. The record contains positive testimony that he alienated Rupert from his relatives and instituted an active campaign to work himself into his patient's gratitude. We are satisfied that those witnesses spoke the truth who swore that the appellant told Rupert that Arthur's wife was stealing from the decedent, that she was a poor housekeeper and was guilty of other misconduct. We are also satisfied that the witnesses spoke the truth who testified that appellant told the decedent that he ought to have the management of his property, that he ought to dismiss his guardian, and get his nephew's family out of the house. The evidence warrants a conclusion that, wherever friction developed, the appellant encouraged the decedent, thereby gaining his favor and turning the decedent against those who were his real friends.

We believe that the amount of pressure that constitutes undue influence is dependent upon the power of resistance of the prospective testator. We have reviewed carefully the life of W. C. Rupert, especially its closing chapters, for the purpose of determining his ability to think for himself and to resist improper influences. We believe that his power of resistance was at low ebb in July of 1934. He could be easily turned against his old friends, and, like many elderly people, was readily susceptible to new influences. Surrounded by a loving family, one with Rupert's limited ability to reason correctly might have written a just will; but when all other influences had been excluded and there was present with the testator only the person who had designs upon his estate, even a slight suggestion might suffice to gain the estate and produce an unnatural will. Moreover, such an influence would be hard to de-

tect because the testator would be as happy with his new purpose as he was with his old one.

The will of July 19, 1934, is at total variance with Rupert's three previous wills. The only explanation that we have for this radical departure, unless it be undue influence, is afforded by the following paragraph taken from the new will:

"I have hereto fore given to my relatives what property I desired them to have and it is not my desire to make further gifts to them."

The only relatives were a brother in Chicago, for whom he had never done anything; and his nephew Arthur. It seems to us that the latter had done as much for his uncle as the uncle had done for him. The marked discrepancy between the three previous wills and the new one in favor of the appellant, who was participating in the making of the new one, is a circumstance adverse to him. A circumstance of a similar nature is the secrecy attendant upon the making of the new will and which, strangely, continued for a few days after the death.

■ The appellant had gained the decedent's confidence. It is our belief that he abused that confidence and gained a will in his favor. The influences which he exercised in that direction, in our opinion, were undue.

We realize that we have not mentioned all of the witnesses and have not given a complete narrative of the evidence, but the transcript of evidence consists of 1,116 pages, together with many exhibits. We have, however, read all of it and believe that we have mentioned the important details. We have not mentioned all of the decisions cited in the briefs but we have considered them carefully.

It follows that the decree of the circuit court will be affirmed.

CAMPBELL, C. J., and BELT and KELLY, JJ., concur.