Argued January 27; affirmed March 8; rehearing denied
May 10, 1938

## VANTINE ET AL. *v.* HEILIG ET AL.

(76 P. (2d) 1122)

In Banc.

*John P. Kavanaugh* and *George Mowry,* both of
Portland (John Mowry and W. T. McKeown, both of
Portland, on the brief), for appellants.

*Earl F. Bernard* and *John F. Logan,* both of Portland (Joseph, Veatch & Bradshaw, and Wilbur, Beckett, Howell & Oppenheimer, and Collier, Collier & Bernard, all of Portland, on the brief), for respondents.

KELLY, J. Contestants allege that said Ashley J. Vantine left an estate of the value more than three hundred thousand dollars, ($300,000). Proponents allege that said estate was of no greater value than two hundred and seventy-eight thousand nine hundred and fifty one dollars and thirty-one cents ($278,951.31).

By said will, decedent gave to Frank E. Hart one hundred and fifty dollars per month; to Sue B. Hart, wife of Frank E. Hart, two hundred dollars per month and to Mrs. Margaret I. Brady one hundred dollars per month, during their natural lives; and to said Margaret I. Brady a life estate in 195.96 acres of land in Marion county, Oregon, and all of the testator's personal belongings located in his residence at 3303 SW. Hood street, Portland.

By the seventh paragraph of said will decedent gave, devised and bequeathed all the rest residue and remainder of his estate to Calvin Heilig, and to his heirs and assigns forever subject to the payment of the bequests above mentioned from the rents, issues and profits derived from lots 3 and 4 and the east half of lots 5 and 6 in block 210, city of Portland.

Decedent nominated J. C. Heilig as executor of said will and requested that he act as such without giving any bond or undertaking.

Contestants assign two errors upon the part of the trial court:

1. In not holding the will in suit to be void upon the ground of undue influence and fraud; and

2. In not holding said will to be void upon the ground of a lack of testamentary capacity on the part of the decedent, Ashley J. Vantine, at the time of its execution.

On December 22, 1868, at Idaho City, Idaho, the decedent, Ashley J. Vantine, was born. On December 6, 1870, decedent's father, William D. Vantine, died leaving as his sole heir and beneficiary his son the said Ashley J. Vantine and his widow Caroline Vantine nee Cosgrove.

Almost immediately upon the death of her husband Mrs. Caroline Vantine returned with her son to the home of her parents, Hugh and Mary Cosgrove, in Marion county, Oregon.

On March 27, 1872, Caroline Vantine purchased lots 3 and 4 in block 210, Portland, Oregon. On September 25, 1874, she purchased another lot, viz., Lot 6 in the same block.

Shortly after purchasing the first two lots in this block Mrs. Vantine and her unmarried sister, Susan Cosgrove, established a home on this site for themselves and the said Ashley J. Vantine.

Mrs. Vantine also acquired residential property on Hood street in South Portland and about 1892 with her said sister, Miss Susan G. Cosgrove, and her son, Ashley J. Vantine, took up her abode there.

On August 3, 1907, Caroline Vantine conveyed to her sister Susan G. Cosgrove for the term of her natural life an undivided one-half of lots 3, 4 and 6 in block 210, Portland, which lots comprise the bulk of the property in suit.

During the month of August, 1907, said Caroline Vantine died intestate at Portland, Oregon. Ashley J. Vantine was her sole heir and through her death became the sole owner of said three lots in block 210

subject to the life estate of Susan G. Cosgrove in an undivided one-half thereof.

Mr. Calvin Heilig came to Portland in 1894 and shortly thereafter met Mr. Vantine. Mr. Vantine was a member of a musical group known as the Boyer Glee Club. Mr. Heilig became interested in the theatrical business. They were both members of the Arlington Club. Thus they became acquainted with each other.

In 1908, Mr. Heilig entered into negotiations with Miss Cosgrove and Mr. Vantine for the leasing of the lots in block 210 for the purpose of erecting a theater building thereon. At that time the property was in a residential district renting for $100 per month, encumbered in the sum of $30,000; and, approximately, the annual taxes thereon amounted to $1,200. The annual taxes thereon are now approximately $16,000.

In order to make the property conform in shape to an approved site for a theatrical building it became necessary to exchange a portion of said property for some adjoining land. This exchange involved the payment by Vantine and his aunt, Miss Cosgrove, of the sum of $5,000. This money was supplied by Mr. Calvin Heilig. The exchange above mentioned was made April 1, 1909, and embraced a transfer by one Iver Johnson to Ashley J. Vantine of the east half of lot 5 in consideration of said $5,000 and the transfer by said Vantine and his aunt to said Johnson of the west half of lot 6 in said block 210.

A lease was executed bearing date March 1, 1909, acknowledged by the lessors, March 16, 1909, and recorded April 9, 1909, on page 61 of book 456 records of deeds in Multnomah county, whereby said lots were leased by Ashley J. Vantine and Susan G. Cosgrove to Calvin Heilig for the term of ninety-nine years, that

is to say, from the first day of April, 1909, to the first day of April, 2008.

The rent agreed upon was at the rate of $350 per month for the first year of said term; $550 per month for the ten years next ensuing; $632.50 per month for the subsequent ten years; $727.37 per month for the fifty years next ensuing, that is from and after the first day of April, 1930, to April 1, 1980; and $836.47 per month for the last twenty-eight years of said term, that is from April 1, 1980, to April 1, 2008.

On July 19, 1909, this lease was assigned by Calvin Heilig to the Heilig Theater Company, a corporation, of which said Calvin Heilig was and is the majority stockholder.

On April 9, 1914, Susan G. Cosgrove died. The testimony discloses that Ashley J. Vantine was a well-educated man. He attended Harvard University, had received a legal education at law school and in 1893 was admitted to the bar in Oregon. While a young man he had made a trip to the Orient. He was fond of literature, the theater, his clubs, his flowers, his friends and his dogs. We regret to record that at times he was overly fond of liquor. He was a pleasing and cultured conversationalist and never knew the need of a dollar. He never married. The testimony convinces us that he was not easily influenced by others.

In 1924, Mr. Vantine underwent an operation for the removal of his prostate gland. In March, 1931, he was again in the hospital for a rectal operation. In September, 1931, he suffered a paralytic stroke affecting the use of his right arm and leg. Because of this stroke he was confined in the hospital from September 10 until October 24, 1931, at which last named date he returned to his residence and thereafter spent most of his time

until again taken to the hospital in February, 1935, where he remained until his death.

Much is set forth in contestant's briefs in support of the claim that Mr. Calvin Heilig exercised undue influence upon Mr. Vantine in the matter of the execution of the will in suit.

We find both Heilig and Vantine interested in music, theater, literature, both suffering similar ailments and undergoing similar surgical operations. We find Vantine, while in physical health, frequently calling upon and visiting with Heilig at Heilig's apartments. When Vantine's paralytic stroke physically incapacitated him, we find Heilig, at Vantine's urgent invitation and entreaty, calling upon Vantine at weekly or bi-weekly intervals. At all times, Vantine had attendants, other than Heilig or any one acting under Heilig's direction. It is true that Vantine and Heilig discussed the relative merits of their respective surgeons and physicians; but there is nothing in the record which in any way adversely reflects upon Mr. Heilig's conduct or counsel.

■ We agree with the learned trial judge that any presumption or inference of questionable practice antagonistic to the testator's interest which might otherwise arise because the attorney who wrote the will and the one who acted as one of the attesting witnesses were associates in the firm of attorneys which had been, and at the time of the execution of the will in suit still were, representing Mr. Calvin Heilig's legal interests, was overcome by proponents' rebuttal testimony which was courteously confirmed by contestants' counsel in his absolution of Mr. Bradshaw and refutation of any improper motives or practices.

The testimony discloses that Vantine told Mr. Heilig that he desired to make a change in his will and re-

quested Heilig to secure the services of a lawyer to that end. Mr. Heilig attempted to procure the services of Mr. (now Federal Judge) Haney. Mr. Haney referred Mr. Heilig to R. C. Bradshaw. Mr. Bradshaw testified in effect that on the 24th day of August, 1934, Mr. Heilig came to Mr. Bradshaw's office and asked Mr. Bradshaw to accompany him to Mr. Vantine's home to attend to some legal matters, the precise nature of which was not stated. Later, the same day, Mr. Bradshaw, Mr. Calvin Heilig and the latter's brother, James Heilig, went to Vantine's home. After Mr. Bradshaw's introduction to Mr. Vantine, as an office associate of Messrs. Joseph & Haney, the firm of which Judge Haney was then a member, a general conversation occurred revolving around the Heilig theater, various actors who had appeared there and the late Mr. George Joseph. Mr. Vantine told Mr. Bradshaw that he desired to change his will, which he said, was in his safety deposit box at the United States National Bank. Mr. Vantine told an attendant where the key to the safety deposit box would be found, and the attendant procured the same. When it was delivered to Mr. Bradshaw, he said that doubtless the bank would furnish a form of an order to be signed by Mr. Vantine authorizing the bank to permit Mr. Bradshaw access to said safety deposit box. Within a day or so thereafter, Mr. Bradshaw procured such form of order from the bank, took it to Mr. Vantine, who signed it. Mr. Vantine instructed Mr. Bradshaw what provisions to include in the new will. Mr. Bradshaw dictated the new will at his office and on the 31st day of August, 1934, returned with Mr. Powers, to Mr. Vantine's home, placed the draft of the will before Mr. Vantine who read it, making comments from time to time as to its various provisions, approved it and executed it in the presence of the attest-

ing witnesses. Mr. Bradshaw testified that Mr. Heilig never at any time discussed the matter of Vantine's will with him or indicated what its provisions or any provision therein should be.

It was suggested, by contestants on argument, that every bit of property Vantine had, came to him through his relatives. It is true that he inherited first from his father and then from his mother the property of his estate, but Mr. Calvin Heilig, by his foresight and good judgment, augmented the value of Mr. Vantine's property to such an extent that by comparison with its present value its value when Vantine inherited it from his mother was not much more than negligible. In a word Mr. Calvin Heilig thus contributed to the value of Ashley J. Vantine's holdings many times more than all of Vantine's ancestors put together.

We find nothing unnatural in Mr. Vantine's testamentary recognition of his friendship for the man who was instrumental in so greatly augmenting his financial resources.

The returned, canceled checks upon Mr. Vantine's bank account could not be found. There is nothing however in the record connecting either Mr. Calvin Heilig or Mr. J. C. Heilig with the loss of these checks issued partly by Mr. Wilbur on behalf of Mr. Vantine and partly by Mr. Vantine himself. The fact that while Mr. Wilbur was acting as his attorney in fact Mr. Vantine insisted upon every check drawn by Mr. Wilbur returned from the bank to Mr. Vantine is evidence of the strength of Mr. Vantine's insistence upon having his affairs conducted as he, Vantine, desired. Mr. Wilbur testified that he tried to induce Vantine to have the canceled checks returned to Wilbur; but to no avail. Mr. Wilbur's services were obtained because

of the effect of a paralytic stroke suffered by Vantine in 1931. Mr. Wilbur acted as attorney in fact for Mr. Vantine from September, 1931, until June 1, 1933.

The fact that shortly before his death and after the execution of the will in suit Vantine requested Mr. J. C. Heilig to pay a number of bills for him does not disclose the exercise of undue influence by the Heiligs or either of them. Vantine suggested that Mr. Heilig take a check from him in the sum of $500 for that purpose. Mr. Heilig cast up the sums involved and advised Mr. Vantine that $300 would suffice and the check was drawn for that amount. No suggestion appears that there was the slightest failure or default on Mr. J. C. Heilig's part in disbursing this money or in fully, fairly and honestly accounting for it.

We find that the record affirmatively discloses that Mr. Calvin Heilig did not exercise or attempt to exercise any undue influence upon Mr. Ashley J. Vantine with reference to the execution of the will in suit.

Contestants cite and quote from *In re Rupert's Estate,* 152 Or. 649 (54 P. (2d) 274). The facts in that case are not at all similar to the facts in the instant case. We need but say that the Rupert case was tried by the experienced and learned trial judge who tried the one at bar. His opinion in the Rupert case was affirmed on appeal. No one would be quicker than he to be guided by the decision in that case when deciding a similar one.

In reference to the claim that at the time of the execution of the will in suit Ashley J. Vantine was not possessed of testamentary capacity, the testimony appears to be of four classes:

1. That of physicians who attended him shortly before, at the time and subsequent to the execution of said will.

2. The opinion of physicians, alienists and psychiatrists based upon an autopsy report made by Dr. Hunter.

3. The opinion of friends, acquaintances and attendants who made practically no reference to drinking intoxicating liquor with Mr. Vantine.

4. The testimony of those who according to their own testimony drank to excess with decedent.

Those of the first group or class were Dr. T. Homer Coffen, Dr. Raymond R. Staub, Dr. Paul Rockey, Dr. Eugene W. Rockey, Dr. William S. Knox.

The first two above named, Drs. Coffen and Staub, called upon Vantine upon the day the will in suit was executed. The others saw him at various times before the execution of the will.

On May 16, 1934, Dr. Coffen was called by Mr. Vantine to attend him as a physician. Dr. Coffen's attendance upon Mr. Vantine continued through May, 1934, June, July, August, September, October and to and including the 20th of November, 1934. We quote from an answer of Dr. Coffen: "But during those first months that I saw him and up to November I have been asked that question; you see, several times, and I still maintain, that so far as I could tell, and I think that I am skillful enough to be able to judge about these things any doctor knows what these things are—I was asked if he was able to understand what was said, and if he was able to sign a legal document, and I have said 'yes' and I still maintain that that is so."

Dr. Staub saw Mr. Vantine at his home professionally on July 2, 1934, July 20, August 31, September 10, September 14, October 13, November 2, 1934, and at the hospital during Mr. Vantine's last illness. We quote from a part of one of Dr. Staub's answers: "I would

say that at all times, at any of the visits at his home, I would say that he was exceptionally capable of any conversation, bringing up incidents of the past, and discussing the circumstances of the present. I would never say that at any time his mind was in any way faltering.''

Dr. Paul Rockey became acquainted with Mr. Vantine in the late nineties and from that time was an intimate acquaintance both socially and professionally, last seeing him in the late spring of 1933. Dr. Rockey considered Vantine an able man mentally.

Dr. Eugene W. Rockey knew Mr. Vantine intimately for a period of thirty years. Dr. Eugene W. Rockey saw Mr. Vantine several times a year up to the spring of 1934, and he testified that he had a sound and disposing mind and memory.

Dr. Knox had been acquainted with Mr. Vantine since 1920, and first treated him in 1926, thereafter calling on him professionally in November, 1926, April, 1927, May, 1933, and July, 1933. Dr. Knox testified that he enjoyed conversing with Mr. Vantine and that in differentiating between one who is sane and one who is wholly and totally insane he thought Mr. Vantine was in full possession of his mental faculties.

No attending physician testified in behalf of contestants.

The second group consists of Dr. Robert P. Smith, Dr. David Livingstone, Dr. F. J. Ernest, Dr. John C. Evans, Dr. Frank R. Menne, Dr. Laurence Selling and Dr. Eugene W. Rockey.

Of this second group of witnesses, the first three above named defined the terms employed by Dr. Hunter in his report upon the autopsy which he had made; and testified in effect that from it they arrived at the conclusion that at the time of the execution of the will in

suit Mr. Vantine's mental faculties were so affected by his physical ailments that he was incapable of understanding the nature of any business transaction. The remaining four of the witnesses named in this second group testified in effect that the autopsy report in their opinion would not support the conclusion thus drawn by the first three.

The third class, that is those who were friends, acquaintances, and attendants, embraces a large number of witnesses. Those who upheld proponents claim that the testator was not mentally incapacitated were Ralph W. Wilbur, Alice M. Snell, Viola Katherine Higley, Frank E. Hart, F. K. Blackadar, Mrs. Louise Neustadter, Mrs. Marjorie Lawson, Mrs. Margaret I. Brady and Dr. Arthur G. Rossman.

Those who expressed an opinion that decedent was mentally incapacitated were Mrs. Virginia P. Brown, Mrs. Susan Templeton, Mrs. Mary Ellen Coleman, Mrs. Elvira Adelia Lawler, Mrs. Mary Ethel Clark, Mrs. Mamie Langeson, Mrs. Delilah Winters, William H. Brewster, David Gowans, and Mrs. D. H. Gowans his wife.

■ When we consider the opportunity that the respective witnesses in the third group or class had to pass judgment, the frequency or infrequency of their contacts with Vantine, and the reasons assigned as a basis for their opinions, we find that the testimony strongly preponderates in favor of the proponent's claim that at the time of the execution of the will in suit the testator was possessed of testamentary capacity.

We have not overlooked the testimony which discloses that at times Mr. Vantine drank to excess. This testimony was not confined to the fourth group of witnesses as above classified.

This fourth group consisted of Basil H. Wagner and Freeman J. Eldridge. These witnesses testify to fantastic and perfervid propositions, plans and schemes suggested by decedent. These appear to have been the flowers of the flowing bowl, the fruit of "the wild anarchy of drink". We say that because each of these witnesses recounts that the grotesque statements and impractical plans related by him were made by decedent while Vantine was drinking with the witness for several hours, consuming brandy, moonshine whiskey, absinthe and using wine for the follow-up drink, sometimes referred to as a chaser.

No good purpose can be served by a further or more specific analysis of the testimony.

As stated, Mr. Brewster, a thoroughly reputable attorney, is among those testifying for the contestants. We are convinced that he testified truthfully, but in the light of the entire record we are unable to agree with his conclusion that at the time of the execution of the will in suit Vantine was not possessed of testamentary capacity. Mr. Brewster had attended to some business for Mr. Vantine and in March, 1934, prepared his income tax report. Mr. Vantine had suggested that Mr. Brewster take over the management of his affairs; then in June or July, 1934, Mr. Brewster called and found Vantine irritable, taciturn, clad in dirty clothes and apparently negligent of all the decencies of physical life. Considering the wealth of testimony that later Mr. Vantine conversed intelligently and presented himself normally both as to garb and conduct, we are led to the conclusion that on the occasion of Mr. Brewster's call in the summer of 1934 it was one of Mr. Vantine's bad days.

The record is such that no discussion of legal principles is necessary. Upon the issues of fact we concur

with the findings of the learned trial judge and for that reason the order of the circuit court admitting the will in suit to probate as the last will and testament of Ashley J. Vantine is affirmed.

LUSK, J., did not participate in this opinion.