Argued December 4, 1940; reversed January 7; rehearing denied
January 28, 1941

In re Brown's Estate

WEEKS *v.* O'NEILL et al.

(108 P. (2d) 775)

*Wm. J. Prendergast, Jr.,* of Portland, and *Hugh C. Gearin,* of Klamath Falls, for appellant.

*A. W. Schaupp,* of Klamath Falls (J. C. O'Neill, of Klamath Falls, on the brief), for respondents.

BELT, J. Tim Brown, a half-breed Indian over 80 years of age, died testate on June 21, 1938, leaving surviving him as his sole heir at law his aged sister Emily Weeks, who is the contestant of her brother's will. It is alleged that the execution of the will was procured through the undue influence of the defendants who are the chief beneficiaries. From a decree sustaining the will, the plaintiff appeals.

The will, which was executed on March 8, 1937, was drawn by the defendant J. C. O'Neill, an attorney at law of Klamath Falls, Oregon. In this will a life estate in 80 acres of land in Klamath county was devised to Tim's nephew, Lorenzo Buford Weeks and, upon the latter's death, to the heirs of his nephew. The remainder of decedent's "heirs and relatives" were each bequeathed the sum of $1.00 for the reason, as stated by the testator in his will, "that during my life time they have failed and neglected to care for me and that they have no regard for me whatsoever." The residue of decedent's estate was devised and bequeathed to defendants J. C. O'Neill and Frank J. Schmitz, share and share alike. O'Neill and Schmitz were also named as executors to serve without bond.

Tim Brown resided most of his life on the Klamath Falls Indian reservation in Klamath county, Oregon. When Tim's mother died she left her property, consisting principally of cattle, to him and his sister Emily. They carried on this cattle business together for many years until Tim took unto himself a common-law wife named Swenna. After Swenna died in 1932, Tim and his sister lived together in comparative happiness until his death. Emily cooked for him and nursed him in sickness. When she became ill and went to the hospital, Tim "broke down and cried."

Although Tim had affection for his sister, it is clear that he disliked her son, Eugene Weeks, whom Tim accused of beating him up in a drunken brawl in May, 1936. Eugene was tried and acquitted of the charge of assault but Tim never forgave him and no doubt always believed him guilty.

Tim, although illiterate, was a shrewd cattle man and, in many ways, was an outstanding Indian on the reservation. He could deal at arm's length with his white brother in the cattle business but when engaging in other transactions with him he was as helpless as a child, as he could neither read nor write. Notwithstanding such handicap, Tim prospered as is evidenced by his leaving an estate originally appraised at $29,000.

Tim made money selling cattle. In "1927 or 1928" his cattle were sold for $36,000. In 1937, the sale of his cattle brought him $4,000. There were various other sales during the preceding years and it is clear from the record that the decedent was fully competent in such transactions to look after his own interests. Prosperity, however, brought on trouble. As one witness expressed it, "everybody seemed to be after Tim's money." Numerous bad loans were made to Indians

and to white men. He was particularly easy to influence in such matters when under the influence of intoxicating liquor. Tim loved his ''fire water'' and he always had it with him. In reference to his excessive use of liquor, J. B. Casey testified that Tim told him, ''Whenever I sell $1,000 worth of cattle I buy $100 worth of whiskey; if I sell $100 worth of cattle, I just buy $10 worth of whiskey.'' Several witnesses testified that Schmitz purchased much whiskey for Tim, but this was emphatically denied by Schmitz.

During the latter years of Tim's life, his property interests were much involved. Taxes became delinquent and many loans were uncollectible. In 1936, Tim's business affairs were in such condition that the Federal Indian office at Beatty urged the appointment of a guardian for him, but such appointment was never made. It is clear, however, that in ordinary business transactions not involving the sale of cattle Tim Brown was almost wholly dependent upon others for assistance. This is indicated by the fact that an account was opened with the First National Bank of Klamath Falls, on November 26, 1934, pursuant to a letter to the bank written on Mr. O'Neill's stationery, as follows:

''Gentlemen:

''Because of my illness I am unable to get into town and I have considerable business to attend to and I wish to instruct you that I want you to recognize the following signature upon checks or drafts drawn upon my account: to-wit: /s/ Tim Brown

> by J. C. O'Neill
> Tim      Brown
> His      Rt. Thumb Print.

On October 26, 1937, an account in the name of Tim Brown was opened in the United States National Bank

at Klamath Falls whereby checks on the same were to be paid by Tim's mark and countersigned by either J. C. O'Neill or Frank J. Schmitz.

It is not contended that Tim did not have sufficient mental capacity to make a will. Contestant, however, asserts that, due to the rigors of old age, ill health resulting from numerous surgical operations, and excessive use of liquor, testator's mind was so weakened that he was very susceptible to the influence of those in whom he reposed confidence.

Frank Schmitz, a white man who operated a general merchandise store on the Indian reservation at Beatty, became acquainted with Tim Brown in 1920. Tim was a good customer at the store. Schmitz often kept money for Tim in his safe as he did for other Indians. Schmitz, on numerous occasions, loaned money to Tim and also borrowed from him.

Schmitz engaged in several business transactions with Tim Brown during the years of their intimate relationship—some of which do not reflect credit upon him and tend to show the influence he had over this half-breed Indian. After Tim sold his cattle for $36,000, Schmitz persuaded him, in 1929, to pay $11,000 for a first mortgage in the sum of $15,000 held by the American National Bank on the Laboree ranch in Klamath county. At the time of this purchase, Schmitz held a judgment lien on the land in the sum of $3,000, subordinate to the mortgage. Schmitz borrowed $1,000 from Tim Brown and purchased other judgments against the land, amounting to $4,000. Tim Brown foreclosed his mortgage and acquired title to the land. Later, in May, 1937—which was after the execution of the will—the land sold to Dave Lisky for $14,000. O'Neill, who handled the transaction for Tim Brown,

had the check representing the purchase price made payable to him. From the proceeds of this sale, O'Neill took $4,000 due him for attorney's fees covering a period of years which he says Tim Brown had agreed to pay him after the sale of the land. O'Neill says that he gave $5,000 in cash to pay Schmitz on account of the judgment liens, in accordance with his instructions from Tim Brown. Schmitz says that he received $7,000. The value of the land as security for the mortgage at that time is indicated by the fact that the bank was willing to take $11,000 for its mortgage. It is apparent that the judgment liens were worthless. They should not have been palmed off upon this old ignorant Indian. Yet, it is argued that he was a shrewd business man!

In explanation of this transaction, O'Neill testified:

"Tim Brown had some sort of a deal with Frank Schmitz, there was some sort of a claim that Frank Schmitz had and Tim Brown wanted to dispose of that as soon as he disposed of the Laboree ranch; he told me at the time. I know he told me to make a settlement with Frank Schmitz.

      *      *      *      *      *

"Q. Why did you pay Frank Schmitz anything? A. Because Tim Brown told me to.

"Q. He had no legal claim? A. Yes, I believe he had.

"Q. How? A. Yes I believe he did have a legal claim, he had evidence to show he had a legal claim.

"Q. What kind of evidence? A. Sufficient evidence."

We regret that Mr. O'Neill did not see fit to point out and show wherein this transaction was fair and above board.

In 1936, Schmitz and Tim Brown went to Pontiac Motor Company at Klamath Falls to get Schmitz' car

which had been left for repair. They came away in a new Pontiac which Tim purchased then and there, making a down payment of $500 in cash. The car was never driven by Tim but was kept in Schmitz' garage. Tim had an old Chevrolet—appraised at $25—which he drove. Schmitz and his wife used the Pontiac exclusively but whenever Tim wanted to go any place they were kind enough to take him in the new car.

In April, 1938—after the execution of the will—Schmitz persuaded Tim, against the advice of O'Neill, to buy a hotel at Beatty for $1,500. O'Neill made a trip to Beatty to see Tim about the proposed deal. Later, the transaction was closed in the office of O'Neill at Klamath Falls. O'Neill was named as grantee in the deed. Schmitz received $100 from the vendor as commission for services rendered. It is difficult to conceive of any reason why, considering his old age and rapidly failing health, Tim should have desired to own a hotel but, of course, he had the right to do so.

Mr. O'Neill became attorney for Tim Brown in about 1930 and such relationship continued until the latter's death in 1938. During the course of years prior to the time he engaged O'Neill to look after his interests, Tim had employed several different lawyers. Apparently he enjoyed litigation as he was often in court and he paid good fees to his lawyers. On several occasions, O'Neill represented him in the trial of law suits. O'Neill took general charge of Tim's business and made many loans and investments for him. It is difficult to conceive of greater trust or confidence than that which was reposed by Tim in his lawyer, O'Neill.

Having shown the intimate and confidential relation existing for many years between the testator and the defendant beneficiaries, we come to the day of the

execution of the will. Schmitz drove Tim to Klamath Falls in the Pontiac car, arriving at O'Neill's office at about 9 o'clock in the morning. Schmitz asserts that he did not know that Tim was going to make a will; that he had never discussed such matter with him; and did not know until the will was executed that he was a beneficiary. After Tim went to the office, Schmitz went about the city transacting what business he had in mind. O'Neill and Tim discussed the will during the morning, and at 1 o'clock Schmitz, O'Neill, and Tim had lunch together. Schmitz did not return to the office until the middle of the afternoon when the will was dictated and prepared for execution. O'Neill testified that he thoroughly explained the will to Tim and that he said "it was the way he wanted it." This statement is corroborated by Mrs. Emma Turner, O'Neill's stenographer who acted as one of the attesting witnesses. Mr. A. C. Yaden, an attorney with offices in the same building, was also called by O'Neill to witness the will.

On direct examination, Mr. Yaden testified as follows:

"Q. Do you remember whether Mr. O'Neill told you he was a beneficiary in this will? A. No he did not. There was no mention to me during the entire time as to the beneficiaries, as to who they were; *I didn't know at any time the contents of the will.* After he introduced me to Mr. Brown I think I inquired and asked how old Mr. Brown was and I think it was mentioned that he had passed eighty; and I asked Mr. Brown if he understood what he was doing, that he was going to make a will, and he nodded his head and said yes; I asked him if he understood how a will operated and went on to explain to him that if he didn't make a will that his property would go to his folks; and Mr. Frank Schmitz broke in and said: 'Well, some of

his folks tried to kill him or beat him up.' And Mr. Brown nodded his head or acquiesced. And we went on to explain to him what was said in the instrument. I had it in my hand for a long time and I asked him if he understood that and he said that he did. It was all explained to him thoroughly and he said that he understood it and that it was all right.

＊　　　　＊　　　　＊　　　　＊　　　　＊

"Q. Did you think that Tim Brown was competent to sign a will at that time? A. Undoubtedly.

"Q. Was he intoxicated? A. Not in the slightest."

On cross-examination:

"Q. Why were you so careful to explain to Tim Brown what the will would or would not do? A. Well, one reason, as an attorney practicing law, I thought it was an unusual thing for an Indian to make a will—most Indians do not make a will—and I wanted to make sure that I inquired to find out if he knew what was going on, what he was going about; I didn't want to be a witness to an instrument that was not all right.

"Q. And did you ask Tim Brown whether Mr. O'Neill had drawn the will? A. No I did not.

"Q. You did not know whether it had been (prepared by) Mr. O'Neill or not? A. No I did not.

＊　　　　＊　　　　＊　　　　＊　　　　＊

"Q. Then didn't you state something about the amount of this estate and didn't Mr. Schmitz again speak up and state that if he made provisions for a number of his friends there wouldn't be enough left in the estate? A. That was stated in the general discussion, in a general conversation, that there might not be property of the estate left. That expression was used or something similar to that. In other words, it was uncertain as to what the estate would be. There was some discussion about that; Mr. Brown was still alive, and he might dispose of it while he was alive, he could make any disposition of it he wanted to. That expression was used.

"Q. Do you remember who it was made that? A. Frank Schmitz.

"Q. Isn't it a fact that some statement was made about the Federal Investigator to the effect that there was something said about Mr. O'Neill having some trust in connection with the will? A. I do not know there was any expression about a trust. The impression that I gathered was that *this was more in the nature of a trust,* but that was more of a conclusion of my own. I do not believe the word, 'trust' was used during the time I was in the office, but it was the general impression that I reached that it had *something to do in some way about having a future trust.*

"Q. Did you know at that time that Mr. Frank Schmitz and Mr. O'Neill were the chief beneficiaries under this instrument? A. No I did not." (Italics ours.)

It was, indeed, unusual for a lawyer to manifest so much concern as an attesting witness to a will. Was Mr. Yaden suspicious under the circumstances? Was that the reason he, as a reputable lawyer, wanted to know what the thing was about? It is clear, however, that Mr. Yaden did not read this short and simple will or he would have known who were the beneficiaries.

After Tim Brown put his mark and thumb print on the will it was duly witnessed. The will remained in the safe of O'Neill until the death of the testator. O'Neill says that a copy of the will was given to the testator, but such copy was not found among his papers nor did any other witness testify to having seen it. It will be remembered that Tim Brown could not read.

■ It is settled in this jurisdiction that the burden of proving the execution of a will to have been the result of undue influence rests upon the party who alleges it: *In re Rupert's Estate,* 152 Or. 649, 54 P. (2d) 274; *In re Knutson's Will,* 149 Or. 467, 41 P. (2d) 793; *Wayne v. Huber,* 134 Or. 464, 291 P. 356,

294 P. 590, 79 A. L. R. 1427. But slight evidence is sufficient to set aside a will on the ground of undue influence when a confidential relationship exists between the testator and the beneficiary: *In re Edwards' Estate,* 141 Or. 595, 17 P. (2d) 570. The burden of proof never shifts from the contestant: *Bliss v. Bahr,* 161 Or. 79, 87 P. (2d) 219; *In re Rupert's Estate,* supra; *In re Putnam's Will,* 257 N. Y. 140, 177 N. E. 399, 79 A. L. R. 1423. However, when it is shown, as in the instant case, that the lawyer who drafted the will for his client is one of the chief beneficiaries, a presumption of undue influence is created which must be rebutted or overcome by proof that he did not abuse the confidence reposed in him and that the execution of the will was the free and voluntary act of the testator: *In re Dale's Estate,* 92 Or. 57, 179 P. 274; *In re Putnam's Will,* supra; *In re Butts' Estate,* 201 Cal. 185, 256 P. 200; *Hunter v. Battiest,* 79 Okla. 248, 192 P. 575; *McQueen v. Wilson,* 131 Ala. 606, 31 So. 94; *Weston v. Teufel,* 213 Ill. 291, 72 N. E. 908. See note 66 A. L. R. 244; Alexander's Commentaries on Wills, Vol. II, p. 898, § 595; Rood on Wills (2d ed.), § 191; 5 Am. Jur., Attorneys at Law, § 51; 28 R. C. L. 146.

The strength of the presumption of undue influence depends upon the particular facts and circumstances in each case. It varies with the strength or weakness of the mind of the testator. Of course, it requires much less influence to control the will of a person of weak mind and infirm purpose than that of one of vigorous intellect and determined character. As stated in 1 Woerner's American Law of Administration, 60:

"What degree of influence will vitiate a will depends much upon the bodily and mental vigor of the

testator, for that which would overwhelm a mind weakened by sickness, dissipation, or age might prove no influence at all to one of strong mind in the vigor of life.''

We think the facts in this case create a strong presumption of undue influence. The pertinent inquiry is whether defendants have overcome such presumption by showing that Tim Brown freely and understandingly executed the will. Does the will truly reflect what the testator had in mind or does it express what the defendants had in mind?

Under the Roman law, such wills were absolutely void. No man was permitted to serve two masters. The courts in this country have not been so hostile to wills drawn by beneficiaries in confidential relationships, but nevertheless have viewed such transactions with suspicion and have demanded clear and satisfactory evidence rebutting the presumption created by law.

If Tim Brown came into the office of Mr. O'Neill for the purpose of making his lawyer a beneficiary of his estate, the matter should have been referred to another lawyer who was in a position to give independent advice to the testator. Thus any suspicion of improper influence would have been avoided. We do not mean to hold as a hard and fast rule, as some courts do, that independent advice is indispensable to the validity of a will executed under circumstances similar to those in the instant case, but such advice certainly would be convincing evidence rebutting any presumption of undue influence. See numerous authorities in note 123 A. L. R. 1505.

It is urged that the following carbon copy of a letter dated January 15, 1937, written by O'Neill to Tim

Brown, meets the requirements of the rule concerning independent advice:

"Dear Tim:

"I have not been able to get out to see you on account of business and bad weather. There is nothing new to report to you.

"I am enclosing herewith the will which you had Manning make and which you had left at the bank. I told them you wanted it and they let me have it. I am sending it so that you may look it over and decide what you want to do about the matter you talked to me about.

"I think you should think it over carefully and when you are ready then come in town. I think you should talk to some one else about this matter too before you do anything about changing it.

"I will look after the taxes for you when they come due in March. I am,

"Very truly yours,"

The original letter was not produced. No witness testified to having seen it nor did any witness testify to having talked with Tim Brown about the contents thereof. Again we advert to the fact that Tim Brown could not read. Is it not probable that, had Tim received such letter, some person in his narrow circle of friends would have known about it? In the letter, reference is made to the Manning will yet the record is silent concerning the names of the beneficiaries in such document. Was Tim's sister a beneficiary in the Manning will? Were O'Neill and Schmitz named as beneficiaries in such instrument? We assume that, if defendants had been so named, it would have been shown.

On direct examination, Mr. O'Neill testified:

"* * * I didn't have any idea or thought at the time that any criticism about my drawing the Will would come up, it never entered my mind."

"Q. Did it ever occur to you as an attorney that the proper thing to do would be to send him to someone else to draw the Will? A. It might have been.

"Q. I ask you the question if it occurred to you. A. I do not believe it did at the time occur to me, either at that time or at the present time. Tim Brown, as I have told you, was a man that if he wanted to do something he wanted to do it and he did; if I had sent him to another man *I might have lost all his business.* That was my idea; I do not believe that he would have approved of that.

"Q. Did you ask Tim Brown to get some of his friends in when you drafted this Will so that there would not be any misunderstanding? A. No I did not, never thought of that. His friends I suppose were there." (Italics ours.)

We are convinced that Tim Brown knew he was making a will but it is not believed that he intended to devise and bequeath absolutely and forever the residue of his estate to the defendants. We think he intended to leave his property in trust with the defendants. The testimony of Mr. Yaden is highly significant in that regard. In keeping with the belief of many old Indians, Tim believed that when he died he was going on a long journey to the happy hunting grounds and that some day he would return to enjoy his estate. The evidence shows that such was his religious belief. Otherwise, why did he have them put $75 in gold in his hand, a bottle of whiskey in his pocket, and meals on his grave? Tim knew he was coming back.

"Lo the poor Indian! whose untutored mind
Sees God in clouds, or hears him in the wind;
His soul proud science never taught to stray
Far as the solar walk or milky way."

Mr. Ernest Hanson, who at one time lived on the reservation at Beatty, said that he talked with Tim

Brown a few days before he died and that Tim told him: "I have got a will and it will make everything right. After I die my money will stay in one place; Joe O'Neill will take care of it and when I come back everything will be right."

"Q. What did he mean by saying 'come back'? A. Reincarnation. Somebody had been telling him about that and he got the fixed idea that he was going to come back after he died."

May Copperfield, an Indian woman who had known Tim since he was 7 years old, testified that she talked with him about a year before he died and that he said "that he had so much money that Mr. O'Neill was to take care of it, that Mr. O'Neill was his lawyer; and he said that if he died Mr. O'Neill would take care of his things, would take care of his grave and things like that."

After careful consideration of the record, we conclude that defendants have not shown that Tim Brown freely and understandingly executed the will in question. The evidence does not overcome the strong presumption of undue influence created by law to protect those who are dependent upon others in transactions of this character.

It follows that the decree is reversed and the cause remanded with directions to set aside and hold for naught the instrument which purports to be the last will and testament of Tim Brown, deceased.

KELLY, C. J., and RAND and ROSSMAN, JJ., concurring.