Argued January 24; reversed February 15, 1944

IN RE LOBB'S WILL

LYONS ET AL. *v.* WILSON ET AL.

(145 P. (2d) 808)

Before Bailey, Chief Justice, and Rossman, Lusk, Brand and Hay, Associate Justices.

*Francis F. Yunker,* of Portland, for appellants.

*W. C. Bristol,* of Portland, for respondents.

BRAND, J. The evidence in this case must be related to four principal issues: First, was there a confidential relationship between Wilson and the testatrix, did the relationship of attorney and client exist, and, if so, was there a personal and intimate relationship of friendship, confidence and trust over and above that of attorney and client? Second, what does the evidence show as to the susceptibility of the testatrix to influence? Third, did Mr. Wilson exert influence upon the testatrix, and was it undue? Was it the proximate cause which produced the will under which he was the sole beneficiary? Fourth, if it shall appear that a confidential relationship existed, then did Mr. Wilson cause the testatrix to receive such independent advice preparatory to the execution of the will as may have been required under the circumstances. Much of the evidence is referable to more than one of the above stated questions. We shall therefore summarize it as a whole, bearing in mind the applicability of each portion of the testimony to the respective issues.

S. F. Wilson is an attorney at law, practicing largely in the field of coporations and trusts. He became acquainted with Mrs. Lobb seven to ten years ago in connection with a mining transaction. In 1935 he represented her professionally for the first time when she

consulted him concerning the sale of a house. For those services he charged her nothing. From 1935 on she consulted him from time to time about her problems. Mr. Wilson testified as follows:

"Q Then you acted as her attorney up to the time of her death?

"A Just from time to time. Sometimes I wouldn't see her for some months, and then sometimes maybe I would see her two or three times a week."

Wilson's testimony is somewhat confused relative to his relationship to the testatrix. At one point he testified that he "never was her real attorney" and that others were her general attorneys. However, he was unable to give the extent to which the attorneys served her. When there was some business matter that was worrying her, she called him repeatedly, and sometimes he "might not hear from her for several weeks." At another point he testified that his calls were professional. He summarized the situation by saying that he had represented her from time to time for six or seven years, and his secretary, Miss Bruns, added that Mrs. Lobb often consulted him. In addition to the long-continued professional service, it appears that he maintained close relations with Mrs. Lobb through his stenographer, Miss Bruns, who had also known Mrs. Lobb over a period of five years. Mrs. Lobb moved from apartment to apartment with considerable frequency. Miss Bruns visited her at her various apartments and performed many services for her at Mrs. Lobb's request. She made deposits and cashed checks for the testatrix. On another occasion Miss Bruns attempted to find a new apartment for her. For a considerable period Miss Bruns called upon Mrs.

Lobb as often as three times a week, at other times once a month. The visits were not purely social, but no charges were ever made by Mr. Wilson on account of them. Miss Bruns borrowed small sums of money from Mrs. Lobb.

■ We come now to the highly persuasive testimony of Miss Fouse. She was at the time of the trial twenty-four years of age and had known Mrs. Lobb since 1936. She appears to be the only one of the various women who had been close to Mrs. Lobb for whom Mrs. Lobb retained warm affection to the very end. In 1936 Mrs. Lobb was living in the Chesterbury Hotel where Miss Fouse and her mother were managing the dining room. Mrs. Lobb was crippled at that time, and Miss Fouse assisted her daily. There is evidence in the record of long affectionate and disinterested relationship between them which continued to the very minute of Mrs. Lobb's death. Miss Fouse first met Mr. Wilson in 1936 or 1937. She testified that Mrs. Lobb bought presents for Mr. Wilson on anniversaries and big holidays and sometimes when the testatrix was unable to go out Miss Fouse would deliver them to him. Toward the later part of the life of the testatrix, Wilson's visits became more frequent. During the last three or four months of her life, Wilson visited her once or twice a week. Prior to that time his visits were less frequent. Miss Bruns visited the testatrix frequently, and at times daily. On Christmas, New Years, Easter, Mothers' Day and on her birthday, Mr. Wilson

"* * * would generally send her flowers or a box of candy or a bottle of nice wine or something like that, and she would shop for him, buy neckties around Christmas and on his birthday, and she painted a picture for him one time."

Miss Fouse testified further as follows:

"Q Did you ever have any conversations with Mrs. Lobb relative to any gifts that Mr. Wilson had offered her?

"A Well, during the last couple of months of her life she was quite excited one day. She told me that Mr. Wilson had offered her a fur coat that belonged to his wife. I think it was a mink coat; it was quite expensive—I wouldn't say that it was mink but it was an expensive coat, and she entertained the idea a little while of accepting, but she didn't."

Miss Fouse testified further concerning a previous will. The evidence was offered for the purpose of showing "the susceptibility to influence and the change of the testatrix' mind." Counsel for the proponents objected to such evidence "as far as it proceeds from statements of the testatrix to this young lady." However, the specific purpose for which the evidence was offered is the specific purpose for which testimony concerning the conduct and declarations of the testatrix is clearly admissible. The objection was not well taken. Miss Fouse testified that she was always aware of Mr. Wilson's visits and that Mrs. Lobb told her of conversations with him. At one time he told her that it was a great comfort to him to be able to visit her there "and that he asked permission to kiss her on the cheek." The proponents themselves offered in evidence a letter written by Miss Fouse to Anna Lyons, one of the contestants. It was received over objections of the contestants. Counsel for proponent stated to the court:

" * * * it is a very relevant factor to find out where those facts on those extraordinary assertions were made and upon what basis, because we have

the right to be informed specifically that it was his will, and, if undue influence, what did it consist of?''

The court said:

"However, it might be well, since the young lady has expressed herself and her views, for her to be given an opportunity to enlighten the Court further on that, and I think for that reason I will permit the letter to be introduced."

Mr. Bristol replied:

"But from the standpoint of being fair to the witness, let her put her own interpretation upon what it meant.

"THE COURT: Yes. She may be able to explain some things that would be helpful to the Court.

"MR. BRISTOL: That is what I mean."

After introducing the letter in evidence, the following question was asked of Miss Fouse, and the following answer was given:

"Q Now, would you say that that letter to Miss Lyons is a true statement, and complete, of all your impressions, boiled down so she could get the view of it?

"A Yes."

Any objection to the letter that might have been urged by the proponents upon the ground of hearsay was waived by them. The letter in question was written in response to an urgent request from Anna Lyons for full information. The letter in part reads as follows:

"Now, Miss Lyons, I have good reason to believe that Wilson unduly influenced your aunt in his favor. Let me tell you why. In the first place for the past three months he has made it a point to call on her at least once a week—I believe she mentioned

her 'beau' to you in one letter. He sent her flowers and bottles of imported wine on her birthday, and Mother's Day and holidays. He told her how much those visits meant to him (she would tell me these remarks the next day) how it cheered his loneliness to feel her gracious hospitality etc—he asked permission to kiss her and received it. There is also a little matter of Wilson's secretary, Miss Brun, who is a witness to the will. She became very friendly with Mrs. Lobb and finally got to the point of borrowing sums of $15.00 and $25.00 for various car repairs etc. Miss Brun drew up another will for Mrs. Lobb which nullified the will that has been just probated. Then a couple of months ago Mrs. Lobb asked for that will back again and destroyed it. All this occurred when she was so sick at the Ongford Apartments about two years ago—Xmas 1939.''

The evidence discloses that the general confidential relationship of attorney and client was established, but it also discloses a relationship no less intimate and confidential which extended beyond the scope and course of the practice of law as generally understood by the profession. What, if any, motive prompted his action is clouded with uncertainty for Mr. Wilson, who was called by the contestants as an adverse witness, was not cross-examined by his own attorney, put in no rebuttal testimony and made no denial concerning the nature of his relationship with the testatrix. The testimony of Miss Fouse certainly indicated that Mrs. Lobb was highly susceptible to the attentions of her attorney and friend. There is credible evidence of the susceptibility of the testatrix to the ingratiating attentions of men and the changeableness of her affections for the women who attended her. Miss Verhoven, a witness for the proponent and an attesting witness to the will,

testified, "I think she was childish. She was rather elderly and changeable, but I think she was in her right mind." Mr. Livingstone, a disinterested witness entitled to the highest credence, had for several years been Mrs. Lobb's financial advisor and had vainly tried to dissuade her from foolish speculation in mining stocks. He described Mrs. Lobb as very tender hearted and "very easily influenced by men" who induced her to sell sound bonds and invest in highly speculative mining stocks. She was not weak-minded, but she did not have sound judgment. On one occasion she gave Mr. Livingstone a diamond bracelet worth $300, to be held for his daughter. He, however, most commendably held the bracelet for the testatrix, and later when she was hard up he returned it to her. His daughter "never even saw it."

Mr. Ralph Thom, assistant manager of the Bank of California, had been acquainted with Mrs. Lobb since 1938 and had assisted her in business affairs at the bank. He testified:

" * * * I would say that if a person would sort of play up to her sympathies or her emotions that she perhaps would be susceptible to that type of influence."

There was no cross-examination.

Concerning the changeableness and susceptibility of the testatrix, Miss Fouse testified:

"Q And what were her feelings toward her nurses?

"A That was a case where I had the opportunity to know particularly, because during these periods when she was sick she naturally had to have a practical nurse with her, and at first they would be fine, and then after about a period of a month

she would begin to complain to me about them, naturally when they were out of the room. They had to live with her so closely—she generally had an apartment or hotel room, and they never lasted longer than about two months at the most. She would either fire them or they would quit because they just didn't get along.''

\* \* \*

"A Over the period of time I knew her I noticed that any advice given to her by a woman would always be criticized and held up very carefully to her judgment, but a man's advice would be more apt to be accepted without questioning. That was an opinion I formed over the period of time I knew her. Anything a man would say she would accept much more readily than a woman.''

There is no evidence of any strained relationship with her nieces and nephews, the contestants. On the contrary, there is strong evidence of her affection for at least one of them, Mrs. Anna Lyons, with whom she maintained an intimate correspondence until her death.

The changeable quality which Mrs. Lobb manifested in her old age appears in her dealings with the various wills which she executed. The first will, which was executed in April, 1939, contained a bequest to Leona Peasley, "a friend", who was in fact her nurse, and for whose help she expressed great appreciation. The bequest was later cancelled. In November, 1939, while at the hospital, it appears from the testimony of Miss Fouse that she made a will containing a bequest of $150 per month to Miss Bruns but later destroyed it. Miss Fouse testified:

" \* \* \* she was worried about that will and said she would like to get it back fom her \* \* \* and later on she told me that she had done that.''

Upon cross-examination by counsel for the proponent, Miss Fouse testified:

"Q Did Mrs. Lobb speak favorably of her? [Miss Bruns]

"A Well, not very much. At first she did. It was just like, I guess, the case of those nurses, then Miss Bruns got coming up to the Ongford every day at noon, and then they got to going out in a car and looking for a house. Miss Bruns wanted to move in with her, and then she got suspicious of her, particularly when she got to borrowing money from her."

It appears that the will in favor of Miss Bruns was destroyed, as we have said. On June 8th, 1940, the codicil was executed cancelling the bequest to Leona Peasley and leaving the entire estate to Mr. Wilson. It appears that the testatrix did not continue satisfied even with the will and codicil which are in issue here. Miss Fouse testified:

"A Well, also I would say in the last month of her life she seemed worried about her present will. I didn't know the terms of it or anything about it, but she seemed to say that she wanted to change her will, and I knew that she was getting along in years, and I would change the subject or tell her, 'Oh, you have a long time to live yet; there is plenty of time for worrying about that', but I know that she was worried about her will. Why I couldn't say, but she seemed to be upset and on edge, the last month of her life particularly, and on the day before she died I recall her speaking of it to me. I had come to see her as usual.

"Q And what did she say:

* * *

"A She said she had been thinking about her will quite a bit and she felt that she would like to

change it. Those were her words, or similar words to that effect.''

■■ In view of the evidence of confidential relations between Wilson and the testatrix and of her susceptibility and changeable nature, we think that there was also evidence from which the trier of the fact could have properly concluded that Wilson exerted undue influence upon her which resulted in the making of the will.

"Slight evidence is sufficient to set aside a will on the ground of undue influence when a confidential relationship exists between the testator and the beneficiary.'' *In re Brown's Estate,* 165 Or. 575, 108 P. (2d) 775 (1941).

We now approach the circumstances surrounding the actual execution of the will and codicil. Mr. Wilson visited Mrs. Lobb at Hillsboro a few days before the execution of the will of April 22nd, 1939. She informed him that she desired to make a will in his favor. He felt that it would be an impropriety for him to draw the will and told Mrs. Lobb that he could not do it but would get someone else to do it. On his return from Hillsboro, Wilson asked Mr. Clark, his office associate, to prepare the will. Mr. Clark had had no conversation or correspondence with the testatrix prior to the drawing of the will, and all information received by him concerning the provisions to be inserted came from Wilson. It appears that Wilson advised him to insert provisions concerning the payment of expenses, the conducting of the testatrix' funeral, the place chosen for entombment, the name of the mortician who was to conduct the funeral, the names of Mrs. Lobb's heirs at law, the contestants, the bequest of One Dollar to each of them, all the

provisions concerning the One Thousand Dollar bequest to Leona Peasley, including a provision that the bequest should be a charge upon and payable only out of the net proceeds of testatrix' farm property near Stratford in King's County, California, the provision concerning a debt to the Lincoln Memorial Park, and the provision making Mr. Wilson the sole beneficiary. In fact, it appears that the only provision of the will which was not inserted upon instructions by Wilson was the one providing that Wilson should serve without bond in his capacity as executor. That provision was inserted upon Mr. Clark's own initiative.

Apparently, having in mind the judicial decisions concerning the importance of furnishing independent advice to a testator who proposes to leave property to a confidential advisor, counsel for Wilson in his brief says:

" 'Office associate' applied to Clark is not the fact. The evidence is they occupied quarters together. The colorable transition is apparent. Clark acted independently of Wilson, and that is his sworn testimony, and the proof."

The record does not support this contention. Mr. Clark, a witness called by the proponent, testified as follows:

"Q Mr. Clark, you are an associate of S. F. Wilson, are you?

"A In a way, yes, I suppose you would call it an associate. We share a common reception room and have offices adjacent to a common reception room.

"Q And you have cases together?

"A Yes, most of his court cases he refers to me; practically none of his office work."

In fact, the relationship between Clark and Wilson appears to have been a close one, although not technically a partnership. Counsel's contention that Clark acted independently of Wilson is not in harmony with the contention at the trial and before this court that Clark was merely a "scrivener." If Mr. Clark's only service was a scrivener, then Mr. Wilson might as well have prepared the will himself as far as independent advice is concerned. Clark then dictated the will to Miss Bruns, Wilson's stenographer. It does not directly appear that Wilson saw the will after it was dictated and before it was signed, but there is room for a reasonable inference that he would have examined it to ascertain if it corresponded to the instructions of Mrs. Lobb to him and to his instructions to Clark. On the day following the drawing of the will, Mr. Clark and the prospective witnesses drove to Hillsboro and to the address furnished by Mr. Wilson. They found Mrs. Lobb in the care of Leona Peasley, the nurse. She was in bed, still crippled from a fall, with failing eyesight, suffering from cancer and eighty-four years of age. There was evidence that Miss Peasley was "excused from the room." The door was shut. Mrs. Clark testified that Mrs. Lobb was sick, but Mr. Clark "would not say she was ill." After some preliminary visiting, Clark handed her the will, her glasses were secured and Mrs. Lobb took some little time reading it through. Clark then read it to her. He testified:

> "I read the thing to her and asked her approval of the language so that I would know that she had mentally comprehended the language used, because I was conscious of the fact that I had prepared the will upon the information as to what her wishes were which had been brought to me by the bene-

ficiary involved, and I was careful to make sure that she understood what was said.''

\* \* \*

"Q Did you go over the matter with Mrs. Lobb of her relatives?

"A No.

"Q You gave her no independent advice and she asked none?

"A No, she asked none.

"Q And you didn't ask her why she didn't leave the property differently, or you didn't explain to her what she could do with her money?

"A No, I did not. I figured that she was a woman of apparent firmness of mind and competence and that she had already told Mr. Wilson that she wasn't going to make a will in favor of the relatives and that there was no need of my discussing her policies; she could make up her own mind.''

The will was executed on April 22nd, 1939, the witnesses being Mr. Clark, his wife and Miss Bruns. On June 7th, 1939, Mrs. Lobb told Miss Bruns that she wished to change the will in respect to Leona Peasley. Miss Bruns testified as follows:

" \* \* \* and I said, 'Well, Mr. Clark is not in the office today.' I said, 'We will have to wait until he is in the office. He will be back in a few days.' She said, 'Well, I want it done now.' She said, 'You can do it, can't you?' and I said, 'Yes, I can do it but I think it would be better to have Mr. Clark do it.' She said, 'No, I want it done now. You do it.' I said, 'All right, I will do it for you', so I went back to the office and I drew up this codicil.''

Mr. Clark being out of the office on the day that Miss Bruns drew the codicil, she showed it to Mr. Wilson and

" * * * asked him what he thought about it. He said, 'It looks all right to me.' "

The codicil was executed at the Ongford Apartments. The attesting witnesses were Miss Bruns and Ruth Verhoven. Miss Verhoven testified that she remembered a man by the name of Wilson being there, but there is testimony that he was not in the room at the time the codicil was executed, and Miss Bruns denied that he had accompanied her to the Ongford. No charge was made by Mr. Clark for his services to the testatrix.

■ We turn to the rules of law and principles of equity which are applicable to the evidence. The burden of proof of undue influence in its true sense (the risk of non-persuasion) is upon the party who asserts it. *In Re Brown's Estate,* 165 Or. 575, 108 P. (2d) 775 (1941); *In Re Knutson's Will,* 149 Or. 467, 41 P. (2d) 793 (1935). The mere fact alone of the existence of a confidential relation between the testatrix and the beneficiary does not create a presumption of undue influence, but that fact, if taken with other suspicious circumstances, may justify an inference of undue influence. Upon this point we have said:

"In considering the question as to whether or not undue influence has been exerted in a particular case, one is naturally led, first, to inquire into the opportunities which the person accused of this species of fraud, had to exert such control over the intention of the testator. Among these is the existence of confidential relations between the testator and the person so charged. While the existence of such a relation will not itself, according to the weight of authority, create a presumption of undue influence, it is a circumstance which, taken in connection with other suspicious circum-

stances, may justify such an inference of undue influence as to put upon a beneficiary the burden of showing, by at least equal evidence and in many jurisdictions, by the preponderance of evidence, that no such influence was exerted. Activity in the preparation of a will, which inures to the benefit or enrichment of the person accused or members of his family, is one of these circumstances." *In Re Dale's Estate,* 92 Or. 57 at p. 64, 179 P. 274 (1919).

In the case at bar we find evidence not only of confidential relationship but also of the susceptibility plus activity on the part of the beneficiary in the preparation of the will. So far as the record now discloses, the dictation of the will by Mr. Clark was a mere formality. It required only the most rudimentary familiarity with legal forms, and the record affirmatively discloses that he gave no independent advice. The inference of undue influence would have been no different if Wilson had himself dictated the will.

■ Notwithstanding the suggestion in the case of *In Re Dale's Estate,* supra, it is clear that the burden of proof of undue influence never shifts. It rests upon the contestant. This is made clear in the case of *In Re Rupert's Estate,* 152 Or. 649, at p. 677, 54 P. (2d) 274 (1936).

"In In re Knutson's Will, supra, we reviewed at length the principle frequently employed in will contest proceedings which holds that a beneficiary of a will who sustained to the testator a confidential relationship, and who actively participated in making the will, must assume the burden of proving that he exerted no undue influence in the making of the will; that is, the burden of coming forward with evidence is reversed. A presumption of undue influence arises from the two circumstances

just mentioned. The ultimate burden of producing conviction still must be discharged by the contestants of the disputed will, but they have the benefit of the presumption of irregularity.''

More recently we said:

"However, when it is shown, as in the instant case, that the lawyer who drafted the will for his client is one of the chief beneficiaries, a presumption of undue influence is created which must be rebutted or overcome by proof that he did not abuse the confidence reposed in him and that the execution of the will was the free and voluntary act of the testator.'' *In Re Brown's Estate* (supra) 165 Or. at p. 585.

■ If proponent still argues that Wilson was not active in the preparation of the will and that Clark's activity amounted to independent advice, he is confronted with the holding in *Peyton v. William C. Peyton Corporation* (Del) 7 A. (2d) 737, 123 A. L. R. 1482 (1939), in which it was held that

"Advice from a law associate of an attorney for a fiduciary is not that independent and impartial advice necessary to sustain a transaction between the fiduciary and his principal.'' (Headnote 7).

That case goes beyond the position taken by this court in *In Re Brown's Estate,* supra, and appears to make the giving of independent advice a strict requirement of law, whereas we view it only as highly relevant in the eyes of equity, but we are in accord with the Peyton case on the point for which it is here cited.

■ Circumstantial evidence is admissible to prove undue influence (*In Re Dale's Estate,* supra) and under the circumstances shown by this record, slight evidence would be sufficient to set aside the will on the ground of undue influence. Upon the authority of *In*

*Re Brown's Estate,* we think a presumption of undue influence would arise from the evidence submitted. It is therefore incumbent upon the proponent of the will to go forward with the evidence or lose the case. The inference which arose from the facts proved (*In Re Dale's Estate,* supra) is here strengthened by other circumstances. On the present state of the record we should be compelled to invalidate the will.

■ We are confronted in this case by an unusual and unfortunate situation. The proceeding is in the nature of that in a suit in equity. Contestants made out a *prima facie* case of undue influence. The trial court erroneously held that there was no evidence thereof and upon motion of proponent over the protest of the contestants dismissed the contest without requiring the proponent to present such rebuttal evidence as he might have. Under these circumstances this court might dispose of the case upon the present record, but it is within our discretion to remand it for the purpose of permitting proponent to offer rebuttal testimony, if any he has, on the issue of undue influence. While the court is reluctant to remand an equity suit for further testimony, we think that it should be done in the instant case.

The decree of the Circuit Court dismissing the contest is reversed. The case is remanded for further testimony by either party, and contestants will have their costs and disbursements incurred to date in the lower court and in this court.