Harry Houston HUBBELL and David L. Fist, as co-executors of the Will of Andrew Jackson Hamel, Deceased, and Harry Houston Hubbell, Individually, Plaintiffs in Error,

v.

Mary Jane HOUSTON and Pearl Whiteside, Defendants in Error.

Mary Jane HOUSTON and Pearl Whiteside, Plaintiffs in Error,

v.

Harry Houston HUBBELL and Henry L. Fist, Individually, and Harry Houston Hubbell, and David L. Fist, as co-executors of the Estate of Andrew Jackson Hamel, Deceased, Defendants in Error.

No. 41407.

Supreme Court of Oklahoma.

June 6, 1967.

Rehearing Denied May 28, 1968.

C. H. Rosenstein, Aaron Mesirow, David L. Fist, Tulsa, for Harry Houston Hubbell and David L. Fist.

John A. Cochran, Tulsa, for Harry Houston Hubbell, individually, Rosenstein, Mesirow, Livingston, Fist & Ringold, Tulsa, of counsel.

Tucker, Boyd & Parks, Spillers & Spillers, Tulsa, for Mary Jane Houston and Pearl Whiteside.

LAVENDER, Justice.

On May 22, 1964, Andrew Jackson Hamel executed an instrument designating it his last will and testament. He had no wife or children, his wife having predeceased him more than a year before. His nearest relatives were brothers and sisters, nieces and nephews. Two of his nephews lived in Tulsa, where he also had resided for a number of years. One of the nephews, Houston Hubbell, was made the sole devisee of the residue of Mr. Hamel's property by the terms of said will. One of the provisions of the will was a bequest of $20,000.00 to Mr. Hamel's attorney who prepared the will. Houston Hubbell and David Fist were designated in the will to serve as co-executors. Two sisters contested the admission of the will to probate when it was offered. The grounds of their objections were that the testator lacked testamentary capacity at the time of the execution of the will, and in the alternative if the will not be denied probate on that ground that the residual provision in favor of Houston Hubbell was invalid because it resulted from undue influence exerted over the testator by his said nephew. The contestants further objected to the provision for the testator's attorney upon the ground that it resulted from undue influence on the part of the attorney-legatee.

These contentions were all denied by the county court, which admitted the will to probate and issued letters testamentary to the co-executors named therein. The contestants appealed to the District Court of Tulsa County, where after a trial de novo upon the above issues the district court entered its judgment affirming the county court in all respects, except the district court refused to admit to probate the residual clause in the will finding undue influence as alleged by the contestants. Motions for new trial were thereafter presented to the district court by both the contestants and the proponents. Both motions were overruled, and judgment was entered by the trial court. The contestants have brought the matter on appeal here arguing that the trial court committed error in admitting to probate the provision in the will by which the attorney was to receive $20,000.00.

This appeal was assigned number 41,407 by this court. The co-executors of the will and Houston Hubbell, individually, prosecuted an appeal here in which they in effect contend the judgment of the trial court on the issue of undue influence was against the clear weight of the evidence. The last mentioned case was assigned our number 41,434. Both cases, because they contain identical issues, refer to the same evidence and involve the same judgment below, were by order of this court consolidated for the purpose of consideration and disposition. The cases are consolidated under case number 41,407.

■ In a will contest it is the duty of this court, in considering the matter on appeal, to examine the entire record and weigh the evidence for the purpose of determining whether the judgment of the trial court was against the clear weight of the evidence. If we find that it was, then it is our duty to enter such judgment as we believe should have been entered by the trial court. In re Chubbee's Will, 133 Okl. 156, 271 P. 681; and In re Hess' Estate, Okl., 379 P.2d 851.

We shall first consider whether the finding by the trial court that the nephew Houston Hubbell exerted undue influence over his uncle, the testator, is against the clear weight of the evidence.

The record is voluminous, and we shall do our best to limit our references to the record to only those matters we consider essential to the issue. (We notice that the contestants have apparently abandoned their earlier contention that Mr. Hamel was not possessed of testamentary capacity, so we shall assume that he was.)

Mr. Hamel came to Oklahoma about 1900 from Missouri. He was experienced in the savings and loan business and engaged successfully in that endeavor in Tulsa. He was able to accumulate a considerable estate estimated at approximately $300,000.00, consisting of real estate, corporate stock and cash. Mr. and Mrs. Hamel were never blessed with children,

and consequently upon her death in March, 1963, he was left living alone, except for a housekeeper, Elizabeth Foster, who had been in the employ of the Hamels for more than twenty years. After the death of Mrs. Hamel, Mr. Hamel entered St. John's Hospital for the purpose of having an operation. Houston Hubbell prior to that time had been a frequent visitor in the home of his aunt and uncle and had been a fishing companion of Mr. Hamel's. The latter, anticipating that he might be incapacitated from taking care of his business for some time following the operation, directed Houston to go to another room in the hospital, in which room Mr. Henry Fist, Mr. Hamel's attorney, happened also to be a patient. As a consequence of this, a power of attorney was prepared by Mr. Fist, or at his direction, by which Mr. Hamel authorized Houston to collect rents, pay bills, and in general transact Mr. Hamel's business to the same extent as he might do if he were able to do so. We consider it significant that this power of attorney was executed by Mr. Hamel at a time *before* he became ill, at a time when even we may expect the contestants to agree that Mr. Hamel was in complete control of his property and of his faculties. We consider it indicative of the fact that Mr. Hamel had great confidence in his nephew's honesty and ability. We are unable to see any other explanation of why this astute and highly successful businessman would confidently and willingly turn over to the nephew all of the uncle's worldly goods consisting of a sizeable fortune. In this connection it should be noted that there was a total absence of evidence (nor was it ever contended) that the nephew in any way misappropriated any of his uncle's property or abused the confidence reposed in him by Mr. Hamel. In connection with this power of attorney, we also notice that the testimony was uncontradicted that Houston did not write a check without the express approval of Mr. Hamel.

Many people, especially those who are successful in the business world, acquiring

and multiplying what to many of us are fortunes, can be described, for want of a more descriptive term, as "rugged individualists," "salty characters," if you will, who are not easily influenced by others. The proponents of the will contend that Mr. Hamel fits in this category. The contestants on the other hand claim that while he may have fit that description at one time in his life, he gradually deteriorated because of his physical condition so that by May 22, 1964, the date of the execution of his will, he was under the influence of his nephew, Houston Hubbell.

These two widely divergent pictures have caused us to carefully consider the testimony of the witnesses not in the light of how the advocate for the one side or the other may view the significance of this or that item of evidence, but rather of how we, from an objective standpoint, might consider it. In reviewing the evidence, we were impressed with the testimony of those witnesses who apparently had nothing to gain from a ruling admitting or denying to probate the residual clause of the will. Among these witnesses were the two nurses, Lahoma Wallace and Frances Neff; the attending physician, Dr. Paul Strong; Mr. Darwin Smith, a building contractor; Mr. Merrell Perkins, an insurance adjustor, and Frank Barnhart, the testator's stock broker and adviser. The nurses had the best opportunity to observe the testator as they took care of him for the last six weeks prior to his passing. They both agreed that testator at that time was a "strong-willed" person, "self-sufficient" and "not easily changed." The doctor testified that in his opinion there was no doubt Mr. Hamel was possessed of testamentary capacity at all times he saw him, which included both the day of the execution of the will as well as afterwards. The building contractor and the insurance adjustor both had occasion to observe and confer with the testator on May 29th (seven days after the will was executed). They both testified that the testator was

possessed of a clearly rational mind, and that he was in control of his affairs. The stock broker testified that the testator was an "astute businessman" who conducted stock transactions as late as early May (before his death in July), and that he had no help from anyone, including the nephew.

It was contended that the testator at one time displayed a tendency to cry and be depressed. This was after the death of his wife and after his own operation for cancer of the colon. The witnesses indicated that as he recovered from the effects of the operation this tendency subsided. We see nothing in this indicative of a weak-willed person. This man was left nearly all alone by the death of his wife; they had been married a long time, and there were no children to soften the blow of her passing. This difficulty was further aggravated by his own illness. Additionally, we see nothing untoward or unnatural in his turning to his nephew, Houston, for companionship and help at this time. The record does not show any other relative was particularly inclined to comfort and aid this elderly gentleman. Mr. Hamel, according to the testimony of the housekeeper, wanted Houston Hubbell to come and take his meals with him. They discussed the condition of the stock market, a subject which interested Mr. Hamel. The nephew took Mr. Hamel to his doctor, to the court house, bank and other places he wished to go. Houston Hubbell did not live with the testator but frequently visited with him.

The contestants point to the fact that Mr. Hamel executed several wills during the period after his operation and before his death, and that in each successive will the nephew was given more favorable consideration. It is true that in the will of November, 1963 (the first in the series of wills) Houston Hubbell was only given an undivided one-half of the residue, while in the will propounded here for probate he was the sole residual devisee. Mr. Hamel told Elizabeth Foster, his housekeeper, that he was taking Frank

Evans (the devisee of the other half of the residue) out of his will because this nephew would have plenty when his folks passed on. It is true also that in various of the wills prior to the one with which we are concerned certain of the bequests to non-relatives were materially reduced, and that this had the incidental effect of increasing the share that would go to the nephew. For instance, in the November will he had provided $10,000.00 for his friend of many years, Mrs. D., but in the April, 1964 will he omitted her entirely. It was also contended in connection with this lady that the nephew had prevented her from visiting with Mr. Hamel in the few months immediately prior to his death. We have reviewed the evidence in this connection and find that the record shows Mr. Hamel apparently had a disagreement with this lady over her efforts in contacting his bank to ascertain if he had received certain proceeds of a stock-split. Her testimony was that she had been promised some of the stock. Mr. Hamel, at any rate, got angry and told his nurse and housekeeper not to let Mrs. D. in the house, and he proceeded to take her out of the will. The record does not support even an inference that the nephew influenced Mr. Hamel to take Mrs. D. out of the will. It is significant in considering these different wills which we are urged show a design on the part of the nephew to enrich himself that the bequests Mr. Hamel made to his brothers and sisters were not changed in any of these four wills. His sisters, Madge Evans and Frankie Hubbell, each received $10,000.00, and the two sisters, contestants here, Pearl Whiteside and Mary Jane Houston, together with the brother, Ralph, all received consistently $10.00 each. We cannot agree with the contestants that these changes in the testamentary disposition of his property constitute proof or even support an inference that the changes were the result of undue influence by the residual devisee over the testator.

In the record there appears a letter from Lucius Hubbell, Houston's brother, which contains wording which the contestants describe as constituting evidence of a conspiracy between Lucius and his brother Houston. In this letter Lucius mentioned Mrs. D., alluding to her efforts apparently to secure for herself certain of the testator's property, and the brother expressed the hope that the love he and Houston had for their uncle would "win out in the end." There is nothing expressed in the letter inconsistent with the natural affection of blood relatives, and no case has been cited and we know of none which holds that to display affection for a relative is to exert undue influence over him.

There is in our view almost a total absence of evidence which would tend to support a finding that the nephew exerted undue influence over the testator. The great weight of the evidence was to the contrary. For example, the uncontradicted evidence was that before executing any of his numerous wills the testator and his attorney had numerous conferences. Mr. Houston Hubbell was not present at most of these, or if he was he took no active part in the discussions. Before the November, 1963 will was prepared in such a way so that it satisfied Mr. Hamel, it required eight conferences between the attorney and the testator. Houston Hubbell was not present at any of these. All of the wills were carefully and painstakingly prepared, obviously in accordance with the exact instructions of the testator. To say that the results of such work should not be admitted upon the evidence in the record would be to effectively destroy a solemnly prepared and carefully executed instrument clearly expressing the will of a man who no longer is living and able to otherwise express his intention. The courts will be reluctant to disturb the intent of a testator under such circumstances.

It is significant, we think, that commencing in the latter part of 1963 and up to near the time of his death Mr. Hamel had his accountants prepare monthly reports and send them to his lawyer with whom he would then confer concerning them. This lawyer testified without con-

tradiction that Mr. Hamel made the decisions in these conferences concerning the conduct of his affairs, and that the nephew was not even present during any of these conferences. We believe this clearly establishes that the nephew was not controlling the activities of the testator during this period. There was no evidence that Houston Hubbell ever used Mr. Hamel's attorney or even was acquainted with him except through Mr. Hamel.

Summarizing then, the record shows at the most that (1) Houston Hubbell was on very friendly terms with his uncle for a long time prior to the latter naming his nephew as the sole beneficiary to the residue of the uncle's estate; (2) that the nephew enjoyed the trust and confidence as well as the affection of his uncle prior to the latter's death; (3) that they were frequent companions and obviously enjoyed the company of each other. Considering the explanation in the record as to why the testator removed Frank Evans from the residual clause, and considering the record concerning his decision to omit Mrs. D. from the will, we consider it not at all unusual that the testator did finally make Houston, who was obviously the closest to him of any of his relatives, the sole recipient of the residue of his estate.

The contestants have directed our attention to Anderson v. Davis, 208 Okl. 477, 256 P.2d 1099, and they say it is controlling upon the situation here. In the cited case, which was the opinion of a divided court with a strong dissent, the principal beneficiary was not a relative of the testator. Also the opinion indicates the beneficiary "had the will drawn." There was some indication that the testator in that case had suffered a decline in "mental competency." In In re Conroy's Estate, 29 Wyo. 62, 211 P. 96, cited in Anderson and relied on in the latter, the following appears:

"The suspicion excited by the fact that the beneficiary drew the will gained strength when it appears that he was a stranger to the blood of the testatrix."

The rule of Anderson, which is to the effect that a presumption of undue influence arises when the testator and the beneficiary are in a confidential relationship is limited by the words used in that case to a will "which is inconsistent with claims of duty and affection" and "when will is drawn by beneficiary." Here the provision for Houston Hubbell was consistent with the blood relationship existing between the testator and the beneficiary and was consistent with the obvious regard the testator exhibited during his life for this beneficiary. We do not agree that the evidence which at most showed a totally non-participating presence during the signing of the subject will amounts to "drawing" or "preparing" the will as described in Anderson. See also In re Lillie's Estate, 195 Okl. 597, 159 P.2d 542.

The presence of beneficiaries and the existence of their confidential relation with the testator at the time of the execution of a will is a circumstance, which, if not shown to bear upon the testamentary act, is not undue influence such as defeats a will. In the Lillie's Estate case, the will was actually typed by one who was a substantial beneficiary. The contestants there raised the "presumption of undue influence" argument based on such facts. The court, citing with approval Re Estate of Llewellyn, 296 Pa. 74, 145 A. 810, 66 A.L.R. 222, said:

"'The active part which gives rise to the presumption must go to the substance of the testamentary act, not to some mere formal matter. In the absence of such procurement, no burden of proof rests on the legatee.'"

The most that was shown was that the nephew had the power, motive and opportunity perhaps to have exercised undue influence, but we have held that such does not authorize an inference of undue influence. Peace v. Peace, 149 Okl. 123, 299 P. 451. In re Martin's Estate, Okl., 261 P.2d 603.

In In re Martin's Estate, supra, the testator dictated her will to her sister to whom

she bequeathed fifty-one percent of all of the property which the testatrix would own at death. Anderson was distinguished upon the fact that in the latter the beneficiary "actively participated" in the preparation of the will, while in Martin's case, the beneficiary merely typed what the testator told her to. Also in Martin the beneficiary was a blood relative, and this was not so in Anderson.

It is somewhat difficult to reconcile the finding of the trial court that the bequest to the attorney, who actually prepared the will and who was a principal beneficiary, was not shown to have resulted from undue influence, while the bequest to the nephew who was a blood relative and who did not "actively participate" in the preparation of the will is tainted. We agree with the trial court that no undue influence was shown with reference to the bequest to the attorney under the circumstances of this case, but we also believe the residual devise was valid.

In re Kuhn's Will, 120 Kan. 13, 241 P. 1087, cited by contestants, was a case from Kansas and involved a statute on the subject and is therefore not in point on the facts.

In re Conroy's Estate, supra, cited by contestants, may best be discussed by noting that in that case (1) the testator was almost illiterate; (2) he was senile and suffered from hallucinations; (3) he died two days after executing the will; (4) the principal beneficiary was unrelated; (5) the beneficiary actually drew the will; (6) the beneficiary signed the testator's name to it; (7) witnessed it; (8) kept the will in his possession and (9) tried to bribe the witnesses to testify as to the testator's capacity.

In Foster v. Brady, 198 Wash. 13, 86 P.2d 760, a Washington case, the testator's doctor was made the principal beneficiary. He was unrelated to the testator, and according to the opinion he "actively participated" in the preparation of the will. There was also an absence of evidence showing any lack of affection on the part of the testator for the natural recipients of his bounty. This case is clearly not in point here.

McCarty v. Weatherly, 85 Okl. 123, 204 P. 632, also cited by the contestants, involved an Indian woman who was blind and unable to speak English. She was being cared for by her granddaughter. The son, who had shown her very little, if any, attention, took her to a lawyer, and the will made him the principal beneficiary. The granddaughter got $1.00. The will was prepared, the court found, "at the instance and direction of (the beneficiary)." The will was held invalid. The case is not in point here.

In re Rupert's Estate, 152 Or. 649, 54 P.2d 274, cited by the contestants, also involved a non-relative who actually was present and making comments at the conferences preparatory to the drafting of the will. Also, he never let the testator out of his sight. In fact, he moved in with him. The court's holding there that a presumption of undue influence was created under these circumstances, we do not regard as persuasive here under the facts of this case.

In In re Brown's Estate, 165 Or. 575, 108 P.2d 775, another Oregon case cited by contestants, the testator was an illiterate man who had been taken advantage of in business by the people who later were the beneficiaries in his will. His attorney drew the will and was the chief beneficiary. There was "active" participation in preparing the will. While the court in that case said it would not lay down the rule that the beneficiary should have sent the testator to another lawyer, the facts of the case were sufficient to show undue influence.

Hunter v. Battiest, 79 Okl. 248, 192 P. 575, is certainly not in point. This was a case in which an attorney had prepared a will by which that attorney was to receive the entire estate of his recent client who at the time of the execution of the will was an inmate of the state prison and a victim of a mortal illness. This court in that case

applied very stringent rules to such a situation, as follows:

"Where one stands in the relationship of attorney to the testator at the time the will is made, and is also the principal beneficiary under the will, the fiduciary relationship being of the highest trust, the law indulges in the presumption that undue influence was used to procure the will, and the burden is on such beneficiary to show the contrary."

■■■ We adhere to the principles enunciated in In Cook's Estate, 71 Okl. 94, 175 P. 507, which are:

"Undue influence, such as will invalidate a will, must be something which destroys the free agency of the testator at the time when the instrument is made, and which, in effect, substitutes the will of another for that of the testator. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution."

This is re-affirmed in In re Lillie's Estate, supra; In re Martin's Estate, Okl., 261 P.2d 603, and In re Fletcher's Estate, Okl., 269 P.2d 349.

The evidence in this record does not satisfy the well-established rule that " * * * Undue influence necessary to invalidate a will is that which, in effect, substitutes the will of others or another for the will of the testator." In re Fletcher, supra.

Nor do we agree that the mere presence of the beneficiary at conferences or at the signing of the will constituted "active participation" in the preparation of such instrument so that when coupled with a confidential relationship might give rise to a presumption of undue influence. The fact that the testator may have told the beneficiary he had drawn a will and provided for certain persons and not others has no significance, in our judgment upon the question of undue influence.

We adhere to the definition so far as here applicable of the term "undue influ-

ence" as set forth in Rose v. Foster, Okl., 288 P.2d 745, which is:

"Undue influence is wrongful influence, and this wrongful influence must have been used to mold the decision of testatrix in preparing her will in order to vitiate a will otherwise valid."

And we hold that circumstances here are not such as to come within the stated definition of undue influence. See also In re Hess' Estate, Okl., 379 P.2d 851, and Holliday v. Holliday, Okl., 327 P.2d 456.

Kindness and attention shown the testator by the principal beneficiary who was a blood relative are not per se the exertion of "undue influence."

"The word, 'undue' when used to qualify 'influence,' has a legal meaning of 'wrongful' so that 'undue influence' necessary to invalidate a will means wrongful influence, but influence acquired through kindness, affection or attention is not wrongful." Huff, Oklahoma Probate Law and Practice, Sec. 112.

Under the facts as shown by the record the judgment of the district court that the residual clause of the May 22, 1964 will of Andrew Jackson Hamel be denied admission to probate because of undue influence, exerted over the testator by the beneficiary thereof, is against the clear weight of the evidence, and the same is therefore reversed and remanded with directions that the residual clause be admitted to probate as a valid testamentary disposition of property.

In considering contestants' contention that the trial court erred in admitting to probate that portion of the will bequeathing Henry L. Fist (the testator's attorney) the sum of $20,000.00, the record discloses that Mr. Fist had known the decedent since about 1919. Through the personal efforts of Mr. Fist, decedent was able to acquire the local agency for Investors Syndicate, which he kept for several years and through it accumulated substantial money and property. He was also associated with decedent as one of the founders of the Morris Plan.

Mr. Fist had performed various legal services for the decedent during the past several years, although it was admitted decedent had also used other attorneys. However, decedent consulted Mr. Fist while he was in the hospital and used Mr. Fist for consultation and drafting of all the wills appearing in this record and to probate his deceased wife's estate.

The cash bequest to Mr. Fist was first added in the January 21st will. The record reflects decedent wanted to express his appreciation for Mr. Fist's efforts in acquiring the Investors Syndicate agency for the decedent, which proved to be very profitable; that Mr. Fist at that time, both during the drafting conferences as well as the execution thereof, expressed his appreciation for this gesture but insisted that it be stricken, whereupon Mr. Fist was informed by decedent that it was his money, he had made it himself and he would do what he wanted with it, and if Mr. Fist would not do as decedent desired then he would get somebody else who would. Mr. Fist continued to express his desires that this cash bequest to him be stricken, or at least reduced considerably, in all of the wills in which it was included.

 It almost goes without saying that a fiduciary relationship existed between the decedent and Mr. Fist. The record clearly indicates that when the testator wanted something done Mr. Fist would simply go ahead and do it as requested and would not argue with him; that the lawyer could not talk the decedent out of giving him something and testified, "Well, I didn't want him to get mad at me, I liked him and I appreciated him and I knew he had been angry at other lawyers from time to time. I didn't want him to get angry with me." We believe the trial court was correct in its conclusion that Mr. Fist acted more or less as a scrivener and wrote down exactly what the testator told him.

In In re Lillie's Estate, supra, the testator had dictated his will to one of the beneficiaries who was not the principal beneficiary. The contestants there argued that a pre-

sumption of undue influence arose from the confidential relationship plus the participation of the beneficiary in the preparation of the will. This court, citing with approval Re Estate of Llewellyn, supra, said:

"No presumption * * * when the activity of the beneficiary in the preparation, drafting, or execution of the will was done at the request of testator."

See also In re Martin's Estate, supra, in which the sister of testatrix and recipient of fifty-one percent of the estate typed the will as it was dictated by testatrix. Here, as in Fletcher's Estate, supra, there was no evidence that the attorney made any suggestions to the testator concerning the testamentary provision for the former except to advise *against* it. Here, also, there was evidence to indicate Mr. Hamel discussed this provision in his will with Houston Hubbell and probaby others. There is nothing to indicate that Houston Hubbell would gain from such a provision in favor of the attorney. In fact, the converse was true. Under these circumstances we are of the opinion that the trial court's judgment determining that the bequest to Mr. Fist was not obtained by undue influence was not against the clear weight of the evidence, and we therefore affirm that portion of the judgment. Battle v. Mason, Okl., 293 P.2d 324.

 Contestants, in support of their contention that the trial court erred in admitting to probate that portion of the will naming Houston Hubbell and David Fist as co-executors and confirming their appointment, cite no specific authority to sustain such contention but merely state "for all the reasons previously discussed in our brief." Such broad reasoning does not present this issue for our appellate review.

Judgment reversed in part, affirmed in part, and cause remanded with directions to admit to probate the residual clause, as well as all other provisions, of the May 22, 1964 will of Andrew Jackson Hamel.

JACKSON, C. J., and DAVISON, WILLIAMS and HODGES, JJ., concur.

IRWIN, V. C. J., and BLACKBIRD, BERRY and McINERNEY, JJ., concur in part and dissent in part.

Those Justices concurring in part and dissenting in part wish to be shown as dissenting to that portion of the majority opinion admitting to probate the residual clause of the testator's will which was in favor of Harry Houston Hubbell; said Justices wish to be shown as concurring in all other portions of the majority opinion.